Nat SCHLESINGER, Petitioner-Plaintiff,

v.

Norman A. CARLSON et al., Respondents-Defendants.

Civ. No. 80–0291.

United States District Court, M. D. Pennsylvania.

April 2, 1980.

---

Barry Ivan Slotnick, New York City, Candor, Youngman, Gibson & Gault, Williamsport, Pa., for petitioner-plaintiff.

Frederick E. Martin, Asst. U. S. Atty., Lewisburg, Pa., for respondents-defendants.

## OPINION

MUIR, District Judge.

Schlesinger filed this action in which he seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 or, in the alternative, an order in the nature of mandamus pursuant to 28 U.S.C. § 1361 alleging that the respondents-defendants have failed to provide him with facilities and food to enable him to observe the Jewish dietary laws. On the same day the petition was filed, Schlesinger filed an application for a temporary restraining order. The petition and the application for a temporary restraining order request the Court to order the respondents-defendants to provide Schlesinger with strictly kosher food or to order his release from confinement. The Court conducted hearings on a daily basis, with the exception of March 25, 1980, from March 24 through March 28, 1980 and on March 31, 1980. Because until 6:40 P.M. on March 28, 1980 the Court was trying a murder case, the hearings on this matter had been sandwiched between the trial of the murder case. Although Schlesinger raises several points, the parties have agreed at this time to consider only his allegations with respect to his inability to observe the Passover holiday which began at sundown March 31, 1980. This opinion will constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

Schlesinger's claim is based on the First Amendment to the Constitution and on Bu-

reau of Prisons regulations. Specifically, 28 C.F.R. § 547.13(a) (1979) provides that all foods, with the exception of raw eggs, fruits and vegetables, which are provided to inmates who observe the Kashruth—Jewish dietary laws—shall be certified or deemed acceptable by the Kashruth division of the Union of Orthodox Jewish Congregations of America or any other Jewish agency deemed acceptable by the inmates at the local institution. Title 28 C.F.R. § 547.13(b) (1979) requires the staff to provide proper utensils for the "preparing, storing, serving, and eating [of] Kosher food." In addition, Schlesinger appears to be taking the position that the First Amendment requires that he be given foods which are kosher for Passover according to his interpretation of the Kashruth and that he be provided with utensils and facilities, also kosher to those standards, with which to prepare those foods.

At the hearing the following facts were established. Schlesinger is a devout Jew and a member of the ultra orthodox Satmar Hassidic sect. He strictly adheres to the Kashruth. He genuinely believes that the kitchen facilities at Allenwood are not kosher for Passover. He is able to eat during Passover certain chickens, meats, vegetables and potatoes available to him at Allenwood. There are also at Allenwood shmura matsos which are kosher for Passover and which were purchased by the Bureau of Prisons with funds donated by the Hassidic community. Schlesinger believes, however, that he is unable to prepare those foods in the kosher kitchen at Allenwood because in his view that kitchen is not, and cannot be made, kosher for Passover despite most unusual efforts towards that end on behalf of the staff at Allenwood and the Jewish inmates.

Jewish dietary laws applicable during Passover require that only foods certified kosher for Passover by appropriate Rabbinical authorities be eaten. This requirement is based on the Biblical injunction that during Passover no chometz be eaten. A grossly simplified explanation of chometz is any food containing leavening agents, certain entire groups of food, and in general any food which is not prepared in a manner which assures that no forbidden matter is introduced into the food. In addition, the utensils used to prepare, cook, serve and eat the food must not have been used at any other time of the year. To do so renders them not kosher for Passover. Further, the kitchen itself and equipment such as ranges, sinks and preparation tables must be made kosher for Passover. These dietary laws apply in addition to the usual kosher laws which again, to oversimplify grossly, prohibit the mixing of dairy and meat products as well as the consumption of certain types of food, most familiarly pork products. Consequently, two sets of all utensils, one for dairy and one for meat, are required.

Allenwood Prison Camp attempts to maintain a kosher kitchen. In that kitchen separate ranges, ovens, utensils, and dishes are provided which are only to be used for kosher foods. As of March 28, 1980, three Rabbis had testified at the hearing that as of that time the Allenwood kitchen was not kosher for Passover. Rabbi Jacob T. Hoenig, employed full-time by the Bureau of Prisons and the chief chaplain at the federal Metropolitan Correctional Center, New York, New York, and Rabbi Abraham Yeret, the Jewish chaplain at Allenwood under a contract with the Bureau of Prisons, are satisfied that the kosher for Passover products at Allenwood had been maintained in a kosher manner. In addition, these Rabbis believe that if they could prepare foods themselves at Allenwood the foods would be kosher for Passover. Rabbi Hoenig also believes that Schlesinger is capable of kashering—making kosher—the range and that if Schlesinger did so Rabbi Hoenig would eat food prepared by Schlesinger on that range during Passover.

Rabbi Hillel Handler, an Hassidic Orthodox Rabbi from New York who toured the Allenwood kitchen on March 27, 1980, is of the opinion that the storage facilities of the kosher foods render them non-kosher. He testified that the kitchen could not be made kosher for Passover in time for the Passover holiday this year.

On March 31, 1980, Dennis E. Watkins, Food Service Administrator at Allenwood, testified concerning the steps taken over the preceding weekend to kasher the kosher kitchen for Passover. In supervising the work which was done to a large extent by the Jewish inmates at Allenwood, Watkins followed the instructions given him by Rabbis Hoenig and Yeret as well as suggestions made by a number of Jewish inmates, including Schlesinger.

In accordance with Rabbi Hoenig's instructions, none of the equipment in the kosher kitchen was used for 24 hours before the kashering process began at approximately 6:30 P.M., Saturday, March 29, 1980. All movable equipment in the kosher kitchen, such as preparation tables, was steam cleaned, then cleaned with a cleaning system in which water was under a pressure of 750 p.s.i., sanded by hand, and then scrubbed with kosher cleanser. Watkins tried to heat bricks for the cleansing process to a red hot stage as suggested by Schlesinger but the bricks exploded before reaching that point. After the tables were thoroughly cleansed they were then covered with aluminum foil in accordance with Rabbis Hoenig's and Yeret's instructions.

To kasher the cooking range, Watkins and the inmates took the range apart to the extent that only the frame remained standing. The broiling elements and grill were removed as was the gas line. All of the parts which could be removed were steamed clean and cleaned with kosher oven cleaner. They were then hand scrubbed and scraped with paint scrapers. The high pressure cleaning machine was then used. Two types of blow torches were used in an attempt to get the metal to the point of being red hot, but this was not possible.

The frame was sprayed twice with oven cleaner and was completely cleaned on all sides, as well as the area underneath it. The gas line and all exposed parts of the stove were wrapped in aluminum foil. Watkins purchased grates similar to those used on charcoal grills to place over the grates on the stove because Schlesinger was concerned that the inability to heat the grates to red hot prevented them from being properly kashered. The additional set of grates was to prevent the kosher pots from touching the perhaps non-kosher range.

The pots and pans were steamed clean, washed and scraped. A sledge hammer head was heated for hours in an attempt to get it red hot and then dumped into a large pot containing water in order to kasher the pot. Many new skillets were purchased especially for Passover as were dishes, bowls, and silverware. A number of pieces of preparation equipment were steam cleaned. In addition to the new utensils, last year's Passover utensils which had been sealed in boxes were brought into the kitchen.

The walk-in refrigerator was completely cleaned. That unit measuring 8 feet by 8 feet by 16 feet was emptied of food and cleaned with kosher cleaners and sanded. The shelves in the refrigerator were removed, steam cleaned, and washed with kosher soap. The shelves were then covered with aluminum foil. The kosher for Passover food which had been stored in sealed boxes in a separate part of the food warehouse was placed in the refrigerator. Schlesinger was satisfied that the refrigerator was made kosher for Passover.

To kasher the double stainless steel sink, it was filled to overflowing with boiling water. Heated metal grates were placed in the sinks which caused the water to bubble up over the sides. This was done twice because Schlesinger was not satisfied that when it was first done the water actually boiled over. The sinks were then sanded inside and out. A can of Drano was used in each of the drains. Aluminum foil was then wrapped around the sinks and faucets in accordance with the instructions of Rabbi Hoenig.

Following this procedure, which took approximately 21 hours over the weekend, the Jewish congregation at Allenwood voted 39 to 1 that the kitchen aside from the oven was kosher for Passover. The lone dissenting vote was that of Mr. Schlesinger. Because the Jewish inmates unanimously decided that the so-called kosher oven in the

kitchen could not be made kosher for Passover, Watkins decided that it would not be used to cook meals during Passover. Watkins also decided that to reduce the risks of accidents which might render the kitchen non-kosher, no dairy meals would be prepared during Passover. The only dairy product that will be available will be dried milk certified kosher for Passover by the Union of Orthodox Jewish Congregations of America. During Passover, all kosher meat which must be frozen will be stored in a separate part in the only freezer at Allenwood and other perishables will be stored in the kosher refrigerator. The Allenwood administration last week built an eight-foot partition which partially seals the kosher kitchen from the non-kosher kitchen. There is however, an open doorway in the partition which in Schlesinger's view renders the kitchen non-kosher.

A seder meal was prepared for service on the evening of March 31, 1980. Prior to the service of that meal the dining room at Allenwood was to be thoroughly cleaned and new table cloths placed on the table. During the rest of Passover, however, Jewish inmates would eat in the same dining room and at the same time that non-kosher food is being served. Schlesinger will be free to prepare his own meals and to eat them in the kosher kitchen.

The Court finds that Schlesinger will not, consistent with his religious beliefs, eat any food prepared in the kosher kitchen at Allenwood during Passover because the open partition permits chometz to enter and because the kitchen is relatively accessible to other people, including gentiles. The Court also finds that Schlesinger can prepare nutritious meals from food he had participated in ordering and which he has indicated he can eat if he is provided with a hot plate or similar device in a room which has not contained any food.

■ Before turning to the difficult constitutional question raised by this case, the Court will first determine whether the respondents-defendants are in compliance with Bureau of Prisons regulations. *See Blair v. United States*, 250 U.S. 273, 279, 39

S.Ct. 468, 470, 63 L.Ed. 979 (1919); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J. dissenting in part). It is the Court's view that the Bureau of Prisons' regulations have been complied with. Based on the evidence adduced at the hearing, the Court concludes that the food provided for Passover is approved by the Kashruth division of the Union of Orthodox Jewish Congregations of America as required by 28 C.F.R. § 547.13(a) (1979). The Jewish inmates at Allenwood have not designated any other Jewish agency whose certification would be acceptable to them. In any event, there exists at Allenwood a sufficient variety of foods which Schlesinger has indicated he can eat consistent with his religious beliefs and which will provide a sufficiently nutritious diet during Passover.

Based on the testimony of Mr. Watkins, the Court concludes that the utensils, preparation, storage and serving facilities are kosher as required by 28 C.F.R. § 547.13(b) (1979). It is the Court's view that the actions taken by the food service staff and the inmates over the weekend of March 29 and March 30, 1980 in accordance with the instructions of Rabbis Hoenig and Yeret, have brought the kitchen and food preparation and serving facilities within the requirements of 28 C.F.R. § 547.13(b). Consequently, the Court is of the opinion that the respondents-defendants have complied with applicable regulations.

■ Having concluded that Schlesinger is not entitled to relief because of Bureau of Prisons' regulations, the Court must reach the constitutional claims raised by Schlesinger. Schlesinger argues that regardless of the Bureau of Prisons' obligations under its regulations, he has a First Amendment right to observe Passover in accordance with his religious dictates and his inability to do so constitutes cruel and unusual punishment in violation of the Eighth Amendment. Schlesinger has not forfeited all of his constitutional rights by reason of his conviction and confinement in prison. *See Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Jones v.*

*North Carolina Prisoners' Labor Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). It is also clear, however, that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed.2d 1356 (1948). *See Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). A prisoner retains those First Amendment rights that "are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). In cases of this kind where a prisoner alleges violations of his constitutional rights it is necessary to seek "a 'mutual accommodation between institutional needs and objectives [of prisons] and the provisions of the Constitution that are of general application.' " *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977) (citation omitted).

Schlesinger takes the position, however, that no accommodation may be made between institutional needs and objectives and his First Amendment right to practice his religion. He argues that he must be provided with food and facilities which fully comply with his sincere religious beliefs as to what he can and cannot eat during Passover. It is the Court's view that the exercise of First Amendment rights demanded by Schlesinger is inconsistent with his status as a prisoner and with legitimate penological objectives of the corrections system. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

Schlesinger relies primarily on three cases to support his position. Among them is *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Except for the proposition that the exercise of religious beliefs is a fundamental liberty, a proposition which is fully recognized by the Court and not disputed by the respondents-defendants, *Yoder* is inapplicable. In that case, the question was whether Wisconsin's compulsory education laws could be applied to the Old Order Amish community. The Supreme Court held that the laws could not be applied because of the devastating effect the application of those laws would have on the Amish community in view of the slight state interest served by applying the laws to the Amish. *Yoder* did not involve a question of the constitutional rights of incarcerated individuals. The Supreme Court recognized prior to *Yoder* and since *Yoder* that a person in prison does not enjoy the same First Amendment rights as people on the outside. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Price v. Johnston,* 344 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

Schlesinger also relies on *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975). In *Kahane,* the Court of Appeals for the Second Circuit directed that Kahane be provided with kosher food while incarcerated. Prior to that time the Bureau of Prisons had made no effort to provide Kosher food to Jewish inmates who observed the Kashruth. The Court, therefore, did not address the issue of to whose definition of kosher the food provided must comply. The Court merely observed that it did not appear to impose any hardship on the Bureau of Prisons to provide Kahane with kosher food.

It is thus clear that the factual situation present in *Kahane* was vastly different than the facts of this case. As this opinion makes clear, the Bureau of Prisons and the inmates at Allenwood took great steps to kasher the Allenwood kosher kitchen for Passover. In addition, food is available which is accepted as kosher by the mainstream of the Orthodox Jewish community

and Schlesinger has indicated he is able to eat many of the items available. Unlike *Kahane*, in which no effort was made to allow the prisoner to exercise his religious beliefs, in this case the Bureau of Prisons has made a massive effort to permit Schlesinger to exercise his religious beliefs.

The case of *Moskowitz v. Wilkinson*, 432 F.Supp. 947 (D.Conn.1977) relied on by Schlesinger is also distinguishable. In *Moskowitz* the issue was whether a religious Jew could be required to shave his beard to conform with the Bureau of Prisons' prohibition on beards. In that case, the Court found that the minimal utility of the no beards rule was far outweighed by the religious belief of the prisoner. The Bureau of Prisons, therefore, failed to prove that its restriction was "reasonably necessary in support of an important or substantial interest." *Moskowitz v. Wilkinson*, 432 F.Supp. 947, 949–50 (D.Conn.1977). Clearly, more is involved in this case than whether a prisoner may retain his beard.

■ The Court is aware that concerns of institutional security are not implicated to any significant degree as they were in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) and *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). The Court does not read those cases to mean that only a concern for institutional security may justify restrictions on First Amendment rights. The Supreme Court has made it clear that a prisoner loses those constitutional rights which are inconsistent with his status as a prisoner or with legitimate penological objectives, *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), and that there must be an accommodation between institutional needs and a prisoner's constitutional rights. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). The court commends the attempt by Allenwood officials to prepare the kosher kitchen for Passover. The fact remains that it is still not kosher according to Schlesinger's religious beliefs. Although kashering the kitchen would be one reasonable accommodation between Schlesinger's First Amendment rights and institutional concerns, it is not the only reasonable solution. It is the Court's view that the proper accommodation between Schlesinger's First Amendment rights and legitimate penological objectives is for Schlesinger to be provided with a cooking element in a separate area of the Camp in which to prepare his meals.

Schlesinger's release from custody is not warranted. The decision to place Schlesinger in custody at Allenwood, as opposed to another institution, was made because Schlesinger apparently requested assignment to Allenwood and the Attorney General presumably determined that such confinement was appropriate for Schlesinger. The law is clear that a prisoner loses those constitutional rights which are inconsistent with lawful confinement following a conviction. Schlesinger is not, therefore, entitled to release from custody.

■ Schlesinger has suggested that he could eat foods prepared by his wife and brought into Allenwood. Allenwood officials object to this because it violates their policy prohibiting the importation of food directly to prisoners. The only exception to this rule is made during the Christmas season when all inmates, regardless of religion, are permitted to receive one package of non-perishable foods by mail. That package is thoroughly searched. The reason for this rule is obvious. Packages of food may contain contraband such as drugs, money, alcohol, or even weapons. The problems posed by perishable foods are also obvious. Although no one suggests contraband would be smuggled to Schlesinger, the Constitution does not require a case by case determination with respect to each prisoner. It is enough that the regulation in question is reasonable and serves a valid interest, as this one does. *See Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979). The fact that Allenwood officials are willing to permit an influx of packages by mail once a year does not mean they should be compelled to ac-

cept packages for Schlesinger when there is another way of accommodating his religious beliefs.

The Court recognizes that its decision will not permit Schlesinger to exercise his religious beliefs to the same extent as he could if he were not incarcerated. The Court's order will, however permit him the maximum amount of religious freedom in this regard which is consistent with the legitimate concerns of the Bureau of Prisons. The Constitution requires that no more be done.

■ Bearing in mind the procedural position of the case, the Court will address the special requirements for interlocutory injunctive relief. Generally, a temporary restraining order or preliminary injunction is issued to maintain the status quo. *The Continental Group, Inc. v. AMOCO Chemical Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). In this case, however, Schlesinger wants to alter the status quo. It is the Court's view that this fact does not prevent the Court from ordering interlocutory relief. It does require the Court to ensure that in addition to establishing the usual elements entitling a party to preliminary relief—that there has been demonstrated a probability of success on the merits, that the harm is imminent and that the harm to be avoided by granting the relief outweighs the harm to the respondents and if relevant, third parties, *see A. O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir.1976); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir.1974) —Schlesinger must convince the Court that the equities tip decidedly in his favor.

Based on the evidence presented Schlesinger has made the required showing. As the preceding discussion indicates, Schlesinger has shown a probability of success on the merits on his Passover claim. The Court is convinced that if Schlesinger is not afforded relief, he will not eat non-kosher food until he is in danger of death. This is clearly imminent, irreparable harm. The Court perceives little hardship to the respondents-defendants if Schlesinger is given the relief contemplated by the Court.

The public interest will not be adversely affected by an order requiring prison officials to permit Schlesinger to have a hot plate and access to a room to prepare his meals. It is the Court's view that the nature of the injury which will be suffered by Schlesinger if relief is not granted far outweighs any harm which might befall the respondents-defendants or the public if Schlesinger is granted interlocutory relief.

Based on the foregoing, the Court reaches the following conclusions of law.

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2241.

2. Although the Respondent-defendants have complied with the regulations at 28 C.F.R. Part 547, the First Amendment requires that Schlesinger be given a heating element on which to cook his meals during Passover.

An appropriate order will be entered.

## ORDER

1. The respondents-defendants shall provide Schlesinger with an unused personal heating element capable of producing sufficient heat to boil or fry meat and chicken in an area of the prison camp which is separated from the kitchen and which can be secured in his absence.

2. Schlesinger shall also be provided with two sets of utensils which are either new or which Schlesinger has made kosher for Passover so that he can prepare and eat his food.

3. Schlesinger shall be provided with Empire chickens, Alle Processing Co. meats, fresh fruits, vegetables and potatoes. Such of those items as must be refrigerated or frozen shall be stored only in the kosher refrigerator or kosher section of the freezer and Schlesinger shall be given materials completely to wrap or cover any unsealed foods.

4. In lieu of complying with Paragraphs 1 through 3 of this order, Respondent-defendants may elect

　(a) to transfer Schlesinger to a community treatment center in New York City during Passover or

(b) to grant him a furlough during Passover or

(c) to permit Schlesinger's wife to deliver food to the camp on a daily basis during Passover for Schlesinger.

5. Nothing in this order shall prevent Schlesinger from receiving any other food available at Allenwood which he wishes to eat during Passover.

6. The above-captioned case is placed as the first case on the Court's April, 1980 list for trial in Williamsport, Pennsylvania. Three cases remaining on the March list will be tried before this case is reached on the April list. The pre-trial conference shall be held and delivery of pre-trial documents including detailed findings of fact, shall be made at 9:30 A.M. on the date the case is reached for trial on the remaining issue or issues.

7. A hearing on the application filed by petitioner on April 2, 1980 for bail will be held at 1:00 P.M. on April 3, 1980.