884 F.2d 1242
 58 USLW 2170
 Sheri LIPSCOMB, By and Through her next friend, Carolyn
DeFEHR; Autumn Scalf, and William Scalf, by and through
their next friend Gloria Self, on behalf of themselves and
all others similarly situated, Plaintiffs-Appellants,
v.
Dan SIMMONS, individually and in his official capacity as
Acting Director, Department of Human Resources of the State
of Oregon; and Jess Armas, individually and in his official
capacity as Acting Assistant Director, Department of Human
Resources of the State of Oregon and Acting Administrator,
Children's Services Division, Department of Human Resources
of the State of Oregon, Defendants-Appellees.
 No. 87-4079.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 7, 1988.
Decided Sept. 7, 1989.
 
 Emily Simon and Mark Kramer, Simon Kramer & Fithian-Barrett, Portland, Or., for plaintiffs-appellants.
 Rives Kistler, Asst. Atty. Gen., Salem, Or., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before HUG, FLETCHER and NELSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 Oregon, like every other state, sometimes removes children from their parents' custody because of abuse or neglect. The State often places these children temporarily in foster homes, either with relatives or others. The state and federal governments provide funds to defray the costs of caring for these children. The federal scheme, Title IV-E of the Social Security Act, 42 U.S.C. Secs. 670-676 (1988), provides funds for many foster children, without regard to whether the people with whom the children are placed are relatives. See Miller v. Youakim, 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979).
 
 
 2
 Oregon has a separate system for funding the foster care of children who are not eligible under Title IV-E. The State assists only children who are placed with foster parents who are not related to them, however. See Oregon Revised Code (O.R.C.) 418.625(2). Children who are placed with relatives may qualify for federal assistance through Aid to Dependent Children. These payments are lower than either the state or federal foster-care payments and are unavailable to many children.
 
 
 3
 The named appellants, Sheri Lipscomb and Autumn and William Scalf, are three children residing in Oregon. Sheri Lipscomb suffers from multiple handicaps. All three children were taken by the State from abusive and negligent parents and have close relatives who now wish to care for them. Sheri's aunt and uncle, who do not have medical coverage or private medical assistance for Sheri, and who do not receive state foster care payments or medical benefits on her behalf because they are related to Sheri, are afraid that they will be forced to give Sheri up because of their inability to pay for her medical bills. Autumn and William Scalf's aunt and uncle, who provided a foster home for the children, were forced to give up the children because the State did not provide the children with foster care assistance, and the aunt and uncle were concerned that they would be financially unable to meet the children's needs. The State then placed the Scalf children with unrelated foster parents and now provides the children with foster care benefits and related medical coverage. The parties stipulate that Oregon's denial of state foster care benefits to children who are also ineligible for Title IV-E benefits in some cases has prevented families from providing foster homes to related children who are in the State's custody. The parties also stipulate that other children, like Autumn and William Scalf, have had to leave the homes of relatives who were acting as foster parents because the relatives believed that they could not properly provide for the children without assistance. Some of these children have been placed with nonrelatives and others remain without foster parents in the care of the State.
 
 
 4
 Sheri Lipscomb and Autumn and William Scalf sue on behalf of all needy and dependent children who have been removed from their homes by the State and placed in foster care, and who have been denied state-funded foster care benefits and medical assistance solely because they are related to their foster parents. They challenge as unconstitutional the State's denial of foster care funds to children whose relatives act as foster parents. The district court granted summary judgment to the defendants, finding that Oregon's statute did not violate the equal protection clause. Plaintiffs timely appeal. We reverse.
 
 Standard of Review
 
 5
 We review the propriety of summary judgment de novo. See Blau v. Del Monte Corp., 748 F.2d 1348, 1352 (9th Cir.), cert. denied, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985).
 
 Discussion
 
 6
 I. The appellants have a constitutionally protected liberty interest in being placed with fit relatives
 
 
 7
 Appellants contend that Oregon's denial of foster care funds to children who live with related foster parents violates their constitutionally protected liberty interest in choosing to live with family members. The constitutional right to associate with family members is protected by the due process clause of the fourteenth amendment. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); accord Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978). No right is more sacred,[1] and this right can be abrogated only to protect other very important interests. See Santosky, 455 U.S. at 753, 102 S.Ct. at 1394; Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). The Supreme Court has held that the constitutionally protected "family" extends beyond the nuclear family. Moore v. East Cleveland, 431 U.S. 494, 504, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (plurality opinion) (holding that a grandmother and her two grandsons constituted a "family" entitled to constitutional protection and invalidating a zoning restriction that prohibited them from living together). The fourteenth amendment protects extended family members' right to live together because the American tradition "is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins ... sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." Id.
 
 
 8
 Appellants, children who were removed by the State from their parents' homes for abuse or neglect, have a constitutionally protected liberty interest in being placed with willing and fit close relatives. The Supreme Court, in deciding the question whether a particular relationship is constitutionally protected, has considered three factors: the presence or absence of a biological relationship; whether the origins of the relationship are natural, separate and apart from state law; and whether protection of the interest in the relationship derogates from the liberty interests of the natural parents. See Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 843-47, 97 S.Ct. 2094, 2109-11, 53 L.Ed.2d 14 (1977) [hereinafter Smith v. OFFER ] (holding on the basis of these three considerations that an (unrelated) foster family does not have a constitutionally protected liberty interest in receiving due process prior to return of the child to its natural parents). All three factors militate in favor of a protected liberty interest in this case. The children's relationships with their aunts and uncles are biological; such relationships are part of the social order recognized by the Supreme Court in Moore as deeply rooted in American history and tradition;[2] and protection of children's interest in living with family members, rather than with strangers or than in the care of the State, when they cannot live with their parents, does not threaten the parents' rights.[3] As the Supreme Court held in Moore, "the choice of relatives in this degree of kinship to live together may not lightly be denied by the State." Id. at 505-06, 97 S.Ct. at 1939. The circuit courts have recognized that constitutional protection extends to grandparents' interest in the custody and care of their grandchildren, see Drollinger v. Milligan, 552 F.2d 1220, 1226 (7th Cir.1977), to the custodial interest of a half-sister with whom the children had lived as a family, see Rivera v. Marcus, 696 F.2d 1016 (2d Cir.1982), and to a mother and sister in their relationship with their son and brother, see Trujillo v. Board of County Comm'rs, 768 F.2d 1186, 1189 (10th Cir.1985). We hold that the fundamental right of children to live with close relatives extends to named appellants in this case, who seek to live with their aunts and uncles.[4]
 
 
 9
 II. The State must assist children in its custody to exercise their constitutional right to live with fit members of their family
 
 
 10
 The State burdens the constitutional right to associate with family members when it adopts policies that prevent family members from living together. Moore, 431 U.S. at 498-99, 97 S.Ct. at 1935. Appellant Sheri Lipscomb would like to continue to live with her aunt and uncle. Appellants Autumn and William Scalf wish to return to the home of their uncle and aunt, who were forced to give them up to strangers. By denying funds to the appellants--aid which they need in order to exercise their constitutional right to live with their relatives--the State of Oregon burdens the appellants' constitutional right to associate with their families.
 
 
 11
 Appellees do not dispute that the children have a fundamental right to live with their family members.[5] Indeed, appellees have recognized this right in an administrative regulation and determined that placement with relatives is generally in the best interest of the child.[6] Rather, appellees argue that the State has no constitutional obligation to fund the children's exercise of their constitutional right. Appellees rely on a series of Supreme Court cases refusing to apply strict scrutiny when a state fails to provide a public benefit, even if the result is to discourage or to prevent poor people from exercising their constitutional rights. See, e.g., Harris v. McRae, 448 U.S. 297, 317, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980) (upholding as rational a federal law proscribing Medicaid payments for all nontherapeutic and for some medically necessary abortions by distinguishing between state interference and a state's choice not to fund, and by noting that the funding decision placed indigent pregnant women in no worse position than if the government had subsidized no health care at all); Maher v. Roe, 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977) (refusing to apply strict scrutiny to and upholding a state's decision to fund the expenses of childbirth but not of nontherapeutic abortions, reasoning that even though the State's failure to fund abortions may deter or prevent some women from exercising their right to have abortions, the impediment to exercising that right--the women's poverty--was not state-created); Lyng v. Castillo, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (upholding a provision in the Food Stamp Act that made ineligible for benefits households comprised of relatives who live together, but who do not purchase food and prepare their meals as a group, because the classification of eligible households did not itself "order or prevent any group of persons from dining together"). Appellees argue, in reliance on these cases, that their policy does not violate the Constitution because neither the State's removal of the children from their parents' homes nor its decision not to fund foster care with relatives directly interfered with the children's choice to live with relatives.
 
 
 12
 The public funding cases appellees cite are inapposite. They involve plaintiffs who have no special relationship with the State. When an individual has a special relationship with the State, such as a custodial relationship, the State assumes an affirmative obligation to secure that individual's constitutional liberty. See Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 341 (3d Cir.1987) (holding that prison officials must ensure that funding is available for women to choose to terminate their pregnancies, and distinguishing Maher and Harris on the ground that "[w]hatever the government's constitutional obligations to the free world," the government has an affirmative constitutional obligation to aid the exercise of the fundamental rights of prisoners), cert. denied, --- U.S. ----, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); cf. DeShaney v. Winnebago County Soc. Servs. Dep't, --- U.S. ----, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) ("[W]hen the State takes a person into its custody ... the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."); Escamilla v. City of Santa Ana, 796 F.2d 266, 269-70 (9th Cir.1986) (observing that the State has an affirmative duty to protect when it has a custodial relationship with an individual). By removing children from their parents' custody, making them wards of the state, and placing them in foster care programs, the State of Oregon established a special relationship with these children and thus assumed special constitutional obligations toward them. The State's obligation includes a duty to assist the children to exercise their constitutional rights.
 
 
 13
 The courts have clearly articulated the "special relationship" principle in cases involving prisoners. "Whatever the constitutional obligations to the free world, those obligations often differ radically in the prison context." Monmouth County, 834 F.2d 326, 341 (3d Cir.1986). The government has no affirmative obligation to help free persons to exercise their constitutional right to practice their religion. Yet the government must provide prisoners with special items necessary for the exercise of their faith. See, e.g., McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir.1987) ("Inmates ... have the right to be provided with food ... that satisfies the dietary laws of their religion"); Schlesinger v. Carlson, 489 F.Supp. 612, 618 (M.D.Pa.1980) (holding that an orthodox Jewish inmate is constitutionally entitled to a hot plate and access to a room to prepare Passover meals). Similarly, although the government has no constitutional obligation to assist free women who wish to exercise their constitutional right to end their pregnancies, see Harris v. McRae, 448 U.S. at 316, 100 S.Ct. at 2687, it must ensure that nontherapeutic abortions are provided to female prisoners who elect them, see Monmouth County, 834 F.2d at 344. In Monmouth County, the Third Circuit reasoned that the government has the same constitutional obligation to expend prison funds to facilitate the meaningful exercise of the right to choose to terminate a pregnancy as to accommodate other fundamental rights, such as access to the courts or free exercise of religion.[7] Monmouth County, 834 F.2d at 343. The Third Circuit held that the government's obligation to accommodate the retained rights of inmates arises "[b]ecause of the very fact of incarceration," which deprives prisoners of their abilities to care for themselves. Id. Similarly, the courts have held that government has an affirmative obligation under the eighth amendment to provide prisoners with adequate medical care, food, and housing. See Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (holding that the eighth amendment mandates that the government provide medical care to inmates because incarceration renders inmates dependent upon prison authorities); Newman v. Alabama, 559 F.2d 283, 291 (5th Cir.1977) (holding that the eighth amendment imposes on the government an affirmative obligation to provide prisoners with adequate food, medical care, clothing, shelter, sanitation, and personal safety).
 
 
 14
 The State's obligation to ensure that children in its custody are able to exercise their constitutional rights is even greater than its responsibility toward prisoners. Limitations on prisoners' constitutional rights may be justified by valid penological objectives and security concerns. O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). No such justifications support encroachments on the fundamental rights of children, who are in the State's custody solely because they were the victims of abuse by others. Cf. Plyler v. Doe, 457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982) (stating that children should not bear "the onus of a parent's misconduct").
 
 
 15
 The courts have recognized that the State has affirmative constitutional duties toward foster care children. Like a parent, the State bears the responsibility of protecting the welfare of children in its care. See, e.g., Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 797-98 (11th Cir.1987) (holding that because of the State's special relationship with foster children, a foster child who was beaten in foster home may bring a section 1983 claim against state officials); L.J. ex rel. Darr v. Massinga, 838 F.2d 118, 122 (4th Cir.1988) (holding that because of the State's special relationship with foster children, state officials are not immune from a section 1983 claim based on physical abuse and medical neglect in foster homes), cert. denied, --- U.S. ----, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). The State also assumes the parental responsibility of assisting children in its care to develop religiously. The Second Circuit, in commenting on the constitutional rights of children in New York's foster care program, observed:
 
 
 16
 In the child care context ... the state has a responsibility to act for the parents when the parents are unable to discharge their own responsibilities. Yet in exercising its responsibilities the state must take some steps to assure that the religious needs of the children are met. Providing funds or other assistance for this religious component of the parental obligations that the state has assumed is not gratuitous. The state must either concern itself with the children's religious needs directly or provide funds to assure that these needs are met under the auspices of private agencies.
 
 
 17
 Wilder v. Bernstein, 848 F.2d 1338, 1348 (2d Cir.1988).
 
 
 18
 The right to live with family members is no less fundamental than the right to the free exercise of religion, and, so too, the State has as great an obligation to meet foster children's familial needs as their religious needs.
 
 
 19
 The State of Oregon has failed to fulfill that obligation with respect to the appellants. The due process clause of the fourteenth amendment requires the State to make reasonable efforts to provide constitutionally mandated services to persons in its care. See Youngberg v. Romeo, 457 U.S. 307, 321-22, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982) (adopting a reasonableness standard with respect to the State's substantive obligation under the due process clause to provide safe conditions and training to allow freedom from restraints to mentally retarded persons in state institutions); cf. Wilder, 848 F.2d at 1347 (stating that the free exercise clause requires the State to make reasonable efforts to meet the religious needs of foster care children).
 
 
 20
 Oregon has not made a reasonable effort to assist the appellants to exercise their constitutional right to live with their close relatives. In determining whether a state's treatment of an individual satisfies the substantive requirements of the due process clause, it is necessary to "weigh[ ] the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." Youngberg, 457 U.S. at 320, 102 S.Ct. at 2460. In this case, the balance is easy to strike, because Oregon has provided no meaningful justification for its decision to exclude the appellants' close relatives from foster care funds. Oregon does not dispute that foster placements with close relatives are in the best interests of appellants. In fact, Oregon's legislature has recognized the importance of maintaining family ties by granting members of the extended family first preference for foster care placements. See supra note 5.
 
 
 21
 Oregon's sole justification for denying foster care funds to appellants is that this decision saves money. The State reasons that relatives often have adequate incentive to serve as foster parents for a child without foster care funds. Although "economic factors may ... be considered ... in choosing the methods used to provide meaningful access [to constitutionally mandated services,] ... the cost of protecting a constitutional right cannot justify its total denial." Bounds v. Smith, 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977) (observing that the Supreme Court consistently has required the States to shoulder affirmative obligations to assure prisoners meaningful access to the courts); accord, e.g., Monmouth County, 834 F.2d at 336-37, 343 (holding that prisons must expend funds to accommodate prisoners' rights to choose abortions, just as they must expend funds to facilitate the meaningful exercise of the fundamental rights to access to the courts or free exercise of religion); Wright v. Rushen, 642 F.2d 1129, 1134 (9th Cir.1981) ("costs cannot be permitted to stand in the way of eliminating conditions below Eighth Amendment standards"). Although the Constitution does not require prison officials to adopt the best method of accommodation, they must provide inmates with a meaningful opportunity to exercise their constitutional rights. See, e.g., Campbell v. Miller, 787 F.2d 217, 226 (7th Cir.) (holding that the Constitution mandates "meaningful, not total or unlimited access" to the courts and to counsel (emphasis omitted)), cert. denied, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); Masjid Muhammad-D.D.C. v. Keve, 479 F.Supp. 1311, 1318-19 (D.Del.1979) (holding that Muslim inmates are entitled to a nutritious non-pork diet, but that prison officials are not thereby obliged to provide a particular pork-free diet to them); cf. Shabazz v. O'Lone, 782 F.2d 416, 420 n. 3 (3d Cir.1986) (en banc) (including costs as a relevant factor to be considered in determining whether a potential method of accommodation is reasonable), rev'd on other grounds, O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).
 
 
 22
 The standard of reasonable accommodation does not entangle the courts in difficult calculations regarding the sufficiency of foster care funding for children who live with relatives. The State already possesses a standard by which it may measure the adequacy of foster care payments to children who choose to live with relatives: the levels of funding it provides to children it places with nonrelatives. We observe with regard to the question of reasonableness that in the appellants' cases, the denial of foster care funds to children who reside with relatives fails to effect any savings. On the contrary, the State's denial of foster care funds in the appellants' cases may actually result in greater state expenditures. Because the Scalfs did not receive foster care funding, their aunt and uncle were forced to transfer them to unrelated foster parents. The State then paid the same state funds to the Scalfs as they would have received but for Oregon's discriminatory policy. Sheri Lipscomb's aunt and uncle may also be forced to return their niece to Oregon's Child Services Division. Because of Sheri's severe handicaps, it is likely that she would then be placed in a state institution, where the costs of care may well exceed the stipend now available to children who reside with unrelated foster parents.[8]
 
 
 23
 The appellees argue that children who seek to reside with relatives, but who cannot because their relatives are unable or unwilling to support them, have the alternative of permanent adoption. The State provides assistance to children who are adopted by relatives. O.R.S. 418.330; O.A.R. 412-30-305. We reject appellees' suggestion that Oregon need not concern itself with the appellants' right to reside with close relatives because foster care is merely a temporary situation. In fact, foster care generally is not temporary. See Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children From Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 28 Stan.L.Rev. 625, 626-27 (1976) (noting that in most cases children spend a number of years in foster care, and that adoption is an alternative in only a small percentage of cases). More importantly, foster care is not a temporary situation for appellants. Appellant Sheri Lipscomb is sixteen years old and totally and permanently disabled. The likelihood that she will be adopted is minute or nonexistent. At the same time, she is unlikely to return to the home of her father and stepmother. They are drug addicts who left her without supervision for days. At the time of this appeal, she had been living with her aunt and uncle for nearly two years. Appellants Autumn and William Scalf (ages 13 and 11, respectively) also are too old to be promising candidates for adoption. Their mother has a severe drinking problem and a history of gross neglect of her children. The Scalf children have been under the State's jurisdiction since October of 1985. Because foster care is not a temporary situation for the appellants, Oregon's refusal to provide them with foster care funds may mean they will never again have the opportunity to live with adults they regard as family members.
 
 
 24
 By holding that Oregon's denial of foster care funds to appellants violates the due process clause, we do not suggest that Oregon acts irresponsibly when it removes children from abusive parents; indeed, any other course of action would be unthinkable. Yet in so acting, a state acquires new obligations. When a State removes abused and neglected children from their parents' homes, it assumes responsibility for ensuring that their basic needs are met and their fundamental rights respected. See Wilder v. Bernstein, 848 F.2d at 1348 ("In the child care context ... the state has a responsibility to act for the parents when the parents are unable to discharge their own responsibilities."); cf. Estelle v. Gamble, 429 U.S. at 104, 97 S.Ct. at 291 (" 'it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of liberty, care for himself' " (citations omitted)). Among the most important of these are children's need for and right to familial association. See Moore, 431 U.S. at 504, 97 S.Ct. at 1938.
 
 III. Conclusion
 
 25
 For the foregoing reasons, we reverse the district court's grant of summary judgment to the defendants and hold that the State of Oregon has violated the substantive due process clause of the fourteenth amendment by denying foster care funding to children who live with close relatives. We remand with instructions to the district court to grant the plaintiffs' motion for summary judgment consistent with this opinion.
 
 
 26
 REVERSED and REMANDED.
 
 
 
 [1]
 This right is so fundamental that it has been recognized in the Universal Declaration of Human Rights, the International Covenant on Economic, Social and Cultural Rights, the International Covenant on Civil and Political Rights, and the American Convention on Human Rights, among other international human rights agreements. See Universal Declaration of Human Rights, Art. 16(3) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the state."); International Covenant on Economic, Social and Cultural Rights, Art. 10(1) ("The widest possible protection and assistance should be accorded to the family, which is the natural and fundamental group unit of society, particularly for its establishment and while it is responsible for the care and education of dependent children." (emphasis added)); International Covenant on Civil and Political Rights, Art. 23(1) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State."); American Convention on Human Rights, Art. 17(1) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.")
 
 
 [2]
 Moore, 431 U.S. at 504, 97 S.Ct. at 1938. The role of the extended family in nurturing children is particularly important when parents, whether because of illness, incompetence, or indifference, are incapable of performing this duty. Moore, 431 U.S. at 505, 97 S.Ct. at 1938 (recognizing the traditional importance of the extended family "[e]specially in times of adversity ..., [when] the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life.")
 
 
 [3]
 The Court, in refusing to extend procedural due process protections to a foster family's relationship to a child, stated:
 It is one thing to say that individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have freely entered.... It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right.... Whatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents.
 Smith v. OFFER, 431 U.S. 816, 846-47, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977). In this case, in contrast, we address only the children's interest in placement with extended family members as against the state's interest in placing the children with strangers or retaining the children in its own care. We do not address the question whether the Constitution protects the relationship between a child and extended family members when this relationship conflicts with a parental relationship.
 
 
 [4]
 The children's right to reside with their biological relatives is subject to the relatives' fitness. Just as recognition of children's fundamental right to live with their parents does not prevent the State from removing the children on a showing of unfitness, abuse, or neglect, recognition of children's fundamental right to live with close relatives will not require the State to place children with relatives who are unfit to care for them
 
 
 [5]
 Although the parties argued the constitutionality of Oregon's refusal to fund foster care by relatives as an equal protection issue, appellees recognized the appellants' claim as "at base a due process claim." Because we find that the appellants prevail on the due process theory, we do not decide whether the state's policy also violates the equal protection clause
 
 
 [6]
 O.A.R. 412-27-045 provides:
 CSD will protect a child's right to live with his or her immediate or extended family.... In determining either the temporary or permanent placement of a child, CSD will consider placement with relatives in preference to persons the child does not know.
 O.R.S. 418.937 adopts the same policy with respect to refugee children, giving preference to extended family members over all but natural parents in placement decisions.
 
 
 [7]
 The court did not, however, address the issue whether the County could constitutionally institute a means-based accommodation of an inmate's right. 834 F.2d at 344
 
 
 [8]
 Nor can recognition of the State's duty to expend funds when necessary to facilitate the exercise of children's rights to live with related foster families be assailed as mandating welfare for the wealthy. The constitutional right the State is obliged to facilitate is the right of the child in its custody, not of the family with whom the child seeks to reside. Foster care funding assists the child on whose behalf it is paid and the State's duty to provide it arises solely from the state's custodial relationship with the child, not from the wealth or poverty of the child's relatives