**Ray LINDLEY FOR David A. LINDLEY, Plaintiff–Appellant,**

v.

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services,\* Defendant–Appellee.**

**No. 87–1791.**

United States Court of Appeals, Seventh Circuit.

Argued June 14, 1988.

Decided Nov. 13, 1989.

As Amended Nov. 22, 1989.

* As originally filed, the present appeal named

Otis R. Bowen, M.D., as the defendant-appellee.

Pursuant to Fed.R.App.P. 43(c)(1), we have substituted his successor at the Department of Health and Human Services as the appropriate appellee in this proceeding.

Douglas N. Dorris, Harris, Lambert & Wilson, Marion, Ill., for plaintiff-appellant.

Donna L. Calvert, Donald T. McDougall, Michale T. Lamb, Jeffrey M. Taske, Dept. of Health and Human Services, Chicago, Ill., for defendant-appellee.

Before CUDAHY, FLAUM and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

Under the provisions of the Social Security Act (the "Act"), a wage earner who is entitled to receive old age or disability insurance benefits is also generally eligible to receive Child Insurance Benefits ("CIB") for his or her dependent children. Congress expressly chose, however, to limit CIB eligibility when a benefits recipient adopts an unrelated child after the onset date of the recipient's entitlement. Section 202(d)(8) of the Social Security Act, 42 U.S.C. § 402(d)(8). On the other hand, a comparable limitation is not placed upon CIB eligibility when a benefits recipient, or the wife of a recipient, gives birth to a child after the onset date of the wage earner's entitlement. Ray and Mary Lindley learned of these classifications in the Act when their two applications for CIB for David, their adopted son, were denied by the Social Security Administration (the "Administration") because David was adopted after the onset date of Ray's disability. The Lindleys responded by challenging the constitutionality of section 202(d)(8) under the equal protection component of the due process clause of the Fifth Amendment. They now appeal the magistrate's order upholding the constitutionality of section 202(d)(8) and affirming the denial by the Secretary of Health and Human Services (the "Secretary") of their application for CIB. We affirm.

## I. Factual Background

Ray and Mary Lindley were married on April 22, 1978, two weeks after the April 8, 1978, onset date of Ray's eligibility for disability insurance benefits. For the two years that followed, the Lindleys sought to conceive a child. Their inability to do so prompted them to undergo medical testing, which revealed that Mary suffered from a retroverted uterus. Mary's doctor warned her that even if she were able to conceive, the pregnancy would pose serious health risks for her. In light of that diagnosis, the Lindleys decided to adopt a child. In 1980, they began writing letters to numerous adoption agencies, asking to be put on the waiting lists that invariably exist at such institutions. See generally National Comm. for Adoption, *Adoption Factbook: United States Data, Issues, Regulations and Resources* 47–53 (1985) [hereafter "Adoption Factbook"]. For two years, the Lindleys searched for a child to adopt. Finally, a private adoption agency informed them of the impending birth of David, a child unrelated to either Ray or Mary. The Lindleys' application was approved, and on March 26, 1982, four days after David was born, Ray and Mary initiated formal adoption proceedings. A final order of adoption was entered on August 17, 1982.

On September 1, 1982, the Lindleys applied for CIB for David pursuant to section 202(d) of the Social Security Act.[1] This

---

1. Section 202(d)(1)(C) generally requires that a child must be dependent upon the wage earner for support in order to qualify for benefits. The provision specifically deals with the dependency requirement in cases of children adopted after the wage earner becomes eligible to receive disability insurance benefits. It reads in relevant part:

  (8) In the case of—

  . . . . .

  (B) an individual entitled to disability insurance benefits, . . . a child of such individual adopted after such individual became enti-

tled to such ... disability insurance benefits shall be deemed [ineligible for CIB] unless such child—

  (C) is the natural child or stepchild of such individual (including such a child who was legally adopted by such individual), or

  (D)(i) was legally adopted by such individual in an adoption decreed by a court of competent jurisdiction within the United States,

  (ii) was living with such individual in the United States and receiving at least one-half of his support from such individual ... (II) if he is an individual referred to in subpara-

application was denied by the Administration on February 1, 1983, and the Lindleys chose not to appeal. Concurrently, the Administration initiated a periodic investigation into Ray's continuing eligibility for disability benefits. In November of 1982, the Administration determined that Ray was no longer disabled and that his entitlement to benefits would terminate on January 31, 1983. Ray appealed, and an administrative law judge ("ALJ") reversed the termination decision on September 30, 1983, fully reinstating Ray's entitlement to benefits.

After Ray's reinstatement, the Lindleys submitted a second application for CIB on David's behalf on October 11, 1983. This application was denied by the Administration initially and upon reconsideration, causing the Lindleys to move for a hearing before an ALJ. After hearing the evidence, the ALJ held that David was precluded from receiving CIB under section 202(d)(8) because he had been adopted by the Lindleys after the date Ray became entitled to benefits. The ALJ also rejected the Lindleys' argument that David was not an "after-adopted child"[2] because of the alleged break in Ray's entitlement beginning in November 1982. The ALJ's decision became the final order of the Secretary after the Appeals Council denied the Lindleys' subsequent request for review.

On September 5, 1985, Ray filed a complaint in the district court on behalf of David. In the complaint, David alleged that he is eligible for CIB under the provisions of section 202(d)(8). In the alternative, he alleged that section 202(d)(8) violates his parents' right to equal protection because it precludes them from obtaining CIB for him as an "after-adopted child," while it permits natural parents to obtain CIB for their children born after the wage earner's disability onset date.

The parties consented to having their case heard by a magistrate pursuant to 28 U.S.C. section 636(c). On April 2, 1987, the magistrate issued a decision in which he held that any hiatus in Ray's entitlement prompted by the Administration's continuing disability review did not affect the Lindleys' second CIB application because Ray's eligibility was reinstated retroactively to his initial onset date. The magistrate then upheld the constitutionality of section 202(d)(8) because he found that Congress had a rational basis for its rules governing CIB applications by "after-adopted children." David filed a timely appeal.

On appeal, David reasserts his argument that he is eligible for CIB under the provisions of section 202(d)(8) because of the temporary break in Ray's entitlement. David's principal contention, however, is that the magistrate erred in applying the rational basis test to uphold the constitutionality of section 202(d)(8), since the classification "chills" his sterile parents' fundamental right to become parents by adoption. David contends that the proper standard is strict scrutiny and that the statute cannot withstand such review. He also argues that, in any event, the statute is not even rationally related to Congress' professed purpose of deterring or preventing fraud.

## II. Analysis

A fundamental principle of judicial construction requires that we consider David's statutory claim before reaching the constitutional issue. *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985); *Ashwander v. TVA,*

graph (B), for the year immediately before the month in which began the period of disability of such individual which still exists at the time of adoption, ... or the month in which such individual became entitled to disability insurance benefits, or (III) if he is an individual referred to in ... subparagraph (B) and the child is the grandchild or great-grandchild of such individual or his or her spouse, for the year immediately before the month in which such child filed his or her application for child's insurance benefits, and

    (iii) had not attained the age of 18 before he began living with such individual.

2. The term "after-adopted child" is used by the Secretary to "refer to children adopted after the adopting parent became entitled to old-age or disability insurance benefits under the Act." Appellee's Brief at 2 n. 1.

297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

## A. David's Statutory Claim

■ On appeal, David renews his argument that he is eligible for CIB under the statute because the September 30, 1983, decision of the ALJ, which reinstated his father's entitlement to benefits, also constituted Ray's new disability onset date. David cites *Ross v. Heckler,* 575 F.Supp. 322 (D.Colo.1983), in support of this contention.

In *Ross,* the disabled father and his wife took custody of the father's nephew and filed a petition for adoption during a fourteen-month suspension in the father's disability eligibility. A final adoption decree was not issued until after the father became eligible again for benefits. For this reason, the Secretary concluded that the child was not entitled to CIB because he was an "after-adopted child." The district court reversed. It found that under the statute, a child is "adopted" as of the time the parents take custody of the child and file a petition for adoption. The court concluded that "for the purpose of Section 402(d)(8), an adoption that occurs during a suspension in benefits falls within the meaning of 'before' as used in the first phrase following Section 402(d)(8)(B)." *Id.* at 325.

The district court's holding in *Ross* has no application here. There is nothing in the record to suggest that there was an actual break in Ray's coverage. David does not contend, nor does he present any evidence to suggest, that his father failed

to receive all of his benefit payments through September 30, 1983, while Ray was appealing the Administration's erroneous determination regarding his eligibility. That appeal ultimately resulted in the reinstatement of Ray's entitlement retroactively to 1978, the original onset date of Ray's disability. Therefore, we find that the magistrate correctly decided the statutory claim.

## B. David's Standing To Assert His Parents' Claim

■ Although Ray Lindley has brought this action on behalf of his son David, the essence of the constitutional claim is that section 202(d)(8) classifies the senior Lindleys in a manner that "chills" their right to adopt a child. The Secretary's initial argument, made for the first time on appeal, is that David is without standing. The Secretary concedes that David has suffered direct economic harm because of the Administration's denial of his parents' application for CIB on his account, but nevertheless urges us to conclude that third-party standing doctrine bars David from pressing his parents' interests. The Secretary relies on *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), where the Court held that as a matter of prudence courts should not hear a plaintiff who rests his or her "claim to relief on the legal rights or interests of third parties," even where the plaintiff has alleged an injury sufficient to meet the "case or controversy" requirement of Article III. *Id.* at 499, 95 S.Ct. at 2205.[3]

---

**3.** The constitutional limitations upon our jurisdiction under the "case or controversy" requirement of Article III are now well settled:

> [A]t an irreducible minimum, Art. III requires a party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and is likely to be redressed by a favorable decision, *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

*Diamond v. Charles,* 476 U.S. 54, 70, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)). We are obliged to address David's standing because it is a predicate to our subject matter jurisdiction here. *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541–42 and 546 n. 8, 106 S.Ct. 1326, 1331–32 and 1334 n. 8, 89 L.Ed.2d 501 (1986) (federal appellate court has "special obligation" to consider basis of its jurisdiction irrespective of parties' claims). Since section 202(d)(8) precludes David from receiving CIB, he has undeniably "alleged a personal stake in the outcome of the controversy" sufficient to meet the constitutional require-

Because the Secretary failed to suggest in the district court that prudential considerations should bar David from suing on his parents' behalf, we cannot consider these arguments here. *See Craig v. Boren*, 429 U.S. 190, 193–94, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976) (rejecting as untimely contention by party on direct appeal that prudential considerations militated against third-party standing). In any event, had the Secretary raised the standing issue below, we would still consider that David's constitutional challenge qualifies as an exception to the general prohibition against third-party standing.

In *Singleton v. Wulff*, 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976), the Supreme Court reaffirmed the general rule that the prudential limitation upon third-party standing loses its vitality when the underlying reasons for it are absent. One of the justifications for the limitation is that such a rule of self-governance helps the court avoid unnecessary constitutional determinations. *Id.* In addition, the limitation is based on the assumption that when the advocate before the court is the proponent of his or her own rights, a constitutional issue will be presented in a concrete context and effectively sharpened for resolution. *Id.; see also Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). With these considerations in mind, the Court held in *Singleton* that third-party standing will be entertained when the relationship between two parties is such that enjoyment of the right at issue is inextricably bound up with the activity that the party who is litigating seeks to pursue. At the same time, the non-litigating party must face some sort of obstacle preventing him or her from asserting the right. *Singleton*, 428 U.S. at 114–15, 96 S.Ct. at 2874. Under such circumstances, there is adequate assurance that the plaintiff is pressing the right in a concrete con-

text and that that party is likely to be an effective proponent of the right. *Id.* at 115–16, 96 S.Ct. at 2874–75; *see also Frank Rosenberg, Inc. v. Tazewell County*, 882 F.2d 1165, 1169 (7th Cir.1989) (principal concern of third-party standing cases is whether constitutional issues are presented vigorously and cogently).

David meets the requirements for third-party standing to maintain his parents' constitutional claim. As an initial matter, the relationship between David and his parents is much closer than that in leading cases where standing has been found to exist, as between a physician and a patient, *Singleton*, 428 U.S. at 117, 96 S.Ct. at 2875–76, or between a beer vendor and a class of potential purchasers of the product, *Craig*, 429 U.S. at 195–96, 97 S.Ct. at 455–56. David's assertion of his parents' equal protection interests is inextricably bound up with his own financial well-being as a member of the Lindley family. Further, the fact that David was the real party in interest throughout the administrative appeals process brings into sharp focus the procedural barriers to his parents' ability to assert their own claim below. Even if the challenge were timely, therefore, we believe that David would nevertheless have standing to assert this claim.

C. *The Lindleys' Equal Protection Claim*

■ With respect to the equal protection claim itself, the appropriateness of the test or standard of review is, for all practical purposes, the dispositive consideration. *See Attorney General v. Soto–Lopez*, 476 U.S. 898, 906 n. 6, 106 S.Ct. 2317, 2322 n. 6, 90 L.Ed.2d 899 (1986). David argues that because section 202(d)(8) classifies his disabled adoptive parents in a manner that burdens their right to become parents, the statute merits strict judicial scrutiny. The parents contend that because they are unable to conceive, their right to adopt a child is constitutionally tantamount to their right

---

ments for standing. *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *see also Heckler v. Mathews*, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d

646 (1984) (claim of unequal treatment under benefits provision of Act based on gender classification states judicially cognizable injury).

to have a natural child and is thus a fundamental right under the Constitution. National adoption statistics may lend credibility to this argument, since a couple's inability to conceive is one of the primary factors motivating the decision to adopt. *See generally* Bachrach, *Adoption as a Means of Family Formation: Data from the National Survey of Family Growth*, 45 J. Marriage & Fam. 859 (1983); *Adoption Factbook*, at 55–56. We are sympathetic to the Lindleys' plight, as were the magistrate and the ALJ in this case. Nonetheless, we do not believe that the controlling family rights cases can fairly be read to embrace their contention.

Even though the Constitution makes no reference to family rights, the Supreme Court has made it clear that "freedom of personal choice in matters of family life long has been viewed as a fundamental interest worthy of protection...." *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 38, 101 S.Ct. 2153, 2165, 68 L.Ed.2d 640 (1981) (Blackmun, J., dissenting). Central among these matters are the decisions to have children and to plan the growth of one's family. *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) (liberty interest embraces individual's right "to marry, establish a home and bring up children...."); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (marriage and procreation are "basic civil rights"); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972) (right "to conceive and to raise one's children has been deemed 'essential.'"); *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) (right to privacy encompasses decision to "bear or beget a child") (interpreting *Griswold v. Connecticut*, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965)). The Court has summarized the scope of its family rights holdings by observing that multiple citations are no longer necessary to support the proposition that "a natural parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right." *Santo-sky v. Kramer*, 455 U.S. 745, 758, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (quoting *Lassiter*, 452 U.S. at 27, 101 S.Ct. at 2159–60).

Of course, the Supreme Court's earlier family rights cases all involved the biological family. More recently, however, the Court has cautioned that biological relationships do not exclusively determine the existence of a family. *Smith v. Organization of Foster Families*, 431 U.S. 816, 843, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977). In analyzing a foster family's liberty interest in maintaining its relationship with a foster child, the Court emphasized the emotional attachments that arise from daily familial association. *Id.* at 844, 97 S.Ct. at 2109–10.

Relying on all these family rights cases, either expressly or by implication, the Lindleys contend that an adoptive couple's right "'to have offspring' is also a fundamental constitutional right." Appellant's Brief at 11 (quoting *Skinner*, 316 U.S. at 536, 62 S.Ct. at 1111). We take no issue with the Lindleys' basic point that a couple deciding to adopt must make decisions that are not essentially different from the decision to beget a child biologically. Under the Supreme Court's constitutional approach to such a family rights claim, we should not belittle the similarities between adoption and natural child birth in this respect. Yet there are critical distinctions between adoption and natural childbirth that bear upon the constitutional protection afforded the right to adopt.

In assessing the distinctions between the constitutional interests of the foster family and those of the natural family, the Court pointed out that the foster family's rights arise from state statute. *Id.* at 845, 97 S.Ct. at 2110; *see also Kyees v. County Dept. of Public Welfare*, 600 F.2d 693, 698 (7th Cir.1979) (same); *Drummond v. Fulton County Dept. of Family & Children's Servs.*, 563 F.2d 1200, 1207 (5th Cir.1977) (same). The same is true of adoption. The adoption process is entirely a creature of state law, and parental rights and expectations involving adoption have historically been governed by legislative enactment.

*See generally,* Zainaldin, *The Emergence of a Modern American Family Law: Child Custody, Adoption, and the Courts, 1796–1851,* 73 Nw.U.L.Rev. 1038, 1042 (1979). The Illinois courts have recognized that because the common law does not provide for adoption, all rights and duties relating to adoption are statutory. *Matter of Edwards' Estate,* 106 Ill.App.3d 635, 62 Ill.Dec. 407, 435 N.E.2d 1379 (1982).

On the other hand, the rights to marry and to procreate biologically are older than any state law, and, for that matter, older than the Constitution or the Bill of Rights. *Griswold,* 381 U.S. at 486, 85 S.Ct. at 1682–82. As the Court recognized in *Smith,* the contours of the rights to marry and bear a child "are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" *Smith,* 431 U.S. at 845, 97 S.Ct. at 2110 (quoting *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977)).

■ Because of its statutory basis, adoption differs from natural procreation in a most important and striking way. *See Smith,* 431 U.S. at 846, 97 S.Ct. at 2110–11. Adoption always involves the weighing and balancing of many competing interests. The rights of a couple to adopt must be reconciled with the state's interest in protecting the existing rights of the natural parents, as well as in securing ultimately the welfare of the child. *Smith,* 431 U.S. at 846–47, 97 S.Ct. at 2110–11; *see generally,* Comment, *Best Interest of Children and the Interests of Adoptive Parents: Isn't It Time For Comprehensive Re-*

*form?,* 21 Gonz.L.Rev. 749, 752–73 (1985–86). The Illinois adoption statute is typical: it states that "[t]he welfare of the child shall be the prime consideration in all adoption proceedings." Ill.Ann.Stat. ch. 40, ¶ 1519 (Smith–Hurd Supp.1989); *see also In Interest of Grotti,* 86 Ill.App.3d 522, 42 Ill.Dec. 150, 408 N.E.2d 728 (1980). Among the factors a court must consider in determining whether the proposed adoption is in the child's best interest are the religious belief of the adopters and adoptee, as well as the physical and mental health of all individuals involved and the background, race, ethnic heritage, behavior, age and living arrangements of the adopters. Ill. Ann.Stat. ch. 40, ¶¶ 1519, 1519.1(b).[4] Because the adoption process is entirely conditioned upon the combination of so many variables, we are constrained to conclude that there is no fundamental right to adopt. We also decline to find that the interest in adopting a child falls within the marital privacy right, since the statute requires adopters to submit their personal lives to intensive scrutiny before the adoption may be approved. Thus, we can find neither a fundamental right nor a privacy interest in adopting a child.[5]

■ Even if we could say that there is a fundamental right to adopt, section 202(d)(8) would still survive constitutional challenge. In *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977), the Supreme Court reviewed a provision of the Social Security Act that required termination of payments to secondary beneficiaries upon marriage to non-beneficiaries, but permitted continued payment of benefits to two secondary beneficiaries who married each other. While the right to

---

**4.** Paragraph 1519.1 applies to cases in which a licensed foster parent who has had continuous custody of the child for at least one year seeks the consent of the child's legal guardian to adopt that child. The guardian is required to give first preference to the foster parent over all other applicants, but must make a determination of what constitutes the child's best interest. The statute lists a number of factors, including those to which we refer here, that the guardian must consider in making its determination. The court reviewing that decision is instructed to consider those same factors, along with any others that may be relevant. Ill.Ann.Stat. ch.

40, ¶ 1519.1(c) (Smith–Hurd Supp.1989). We cite these provisions simply as examples of what the legislature means by the child's "best interest."

**5.** We, of course, do not hold that once a child has been adopted, the new family does not have the same rights and privacy interests as a natural family. That is not the issue before us here. We focus only on the *process* by which the family grows, not on the new family that results.

marry has long been considered fundamental, *see, e.g., Meyer v. Nebraska,* 262 U.S. at 399, 43 S.Ct. at 626, and the marital relationship held virtually "sacred," *Griswold,* 381 U.S. at 486, 85 S.Ct. at 1682–83, the Court nevertheless concluded that the provision was "not rendered invalid simply because some persons who might otherwise have married were deterred by the rule or because some who did marry were burdened thereby." *Jobst,* 434 U.S. at 54, 98 S.Ct. at 99–100; *cf. Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (government refusal to subsidize exercise of fundamental right does not constitute violation of that right); *Webster v. Reproductive Health Servs.,* — U.S. —, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (same).

■ Since the Lindleys are unable to show that the classifications in section 202(d)(8) violate a fundamental right (or discriminate against a "suspect class"),[6] our review is limited to determining whether the statute is rationally related to legitimate legislative goals. In that respect, we certainly have no authority to invalidate social legislation as "unwise or inartfully drawn." *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). A classification is not unconstitutional simply because it is not drawn with mathematical nicety or results in some inequality; it must be upheld as long as it has a "reasonable basis." *Weinberger v. Salfi,* 422 U.S. 749, 769, 95 S.Ct. 2457, 2468–69, 45 L.Ed.2d 522 (1975). As the Court noted in *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970), practical problems needing rough accommodations may sometimes bring about illogical or unscientific results.

The Lindleys assert that section 202(d)(8) is overinclusive because it deters disabled beneficiaries from conducting a *bona fide* adoption and denies benefits to those disabled parents who, like the Lindleys, make an adoption that can be proven legitimate in an individualized hearing. The Lindleys also suggest that if the potential for fraud were really the concern of Congress, the statute is *under*-inclusive since fertile parents may have any number of natural children after the onset of their disability in the expectation that each such child would be eligible for benefits.

As a matter of policy analysis, these arguments are not insignificant. For example, it is hard to imagine that disabled parents seeking to adopt an unrelated child merely to obtain CIB would be able in most cases to survive a standard preadoption investigation. Under the Illinois Adoption Act, as in most states, a petitioning couple must be proper persons to adopt a child based on their "character, reputation, health and general standing in the community...." Ill.Rev.Stat. ch. 40, ¶ 1508(A). These requirements have been held to authorize an investigation into the petitioners' financial status as an appropriate consideration. *Waldron v. Waldron,* 106 Ill. App.2d 430, 245 N.E.2d 910 (1969) (unpublished abstract). A disabled couple probably could not withstand such scrutiny if their purpose was simply to obtain CIB for an "after-adopted child."

Despite this fact, the Supreme Court has firmly held that Congress is not required to provide each social security applicant with an individualized hearing. *Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522; *Jobst,* 434 U.S. at 53, 98 S.Ct. at 99. In *Salfi,* the Court upheld a provision of the Act which denied survivor's benefits to a spouse who had been married to the wage earner for less than nine months before he died. The

---

**6.** Even if the Lindleys could establish that infertile social security beneficiaries are a "suspect class," they have not met their burden of establishing that Congress *intended* to discriminate against them in enacting section 202(d)(8). The statute is facially neutral in its effect on all persons receiving social security benefits who wish to adopt a child not related to them by blood or marriage. The Lindleys have demonstrated at most a discriminatory *impact* on infertile beneficiaries. Such a showing will not sustain a Fifth Amendment equal protection challenge to the statute. *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976).

Court's opinion is directly relevant to the Lindleys' claims here:

> While it is possible to debate the wisdom of excluding legitimate claimants in order to discourage sham relationships, and of relying on a rule which may not exclude some obviously sham arrangements, we think it clear that Congress could rationally choose to adopt such a course.

*Salfi,* 422 U.S. at 781, 95 S.Ct. at 2475. The essential question, ruled the Court, "is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule." *Id.* at 777, 95 S.Ct. at 2472–73. Given the enormous size of the social security system, the Court concluded that Congress was indeed justified in prescribing generally applicable eligibility criteria, rather than mandating unwieldy and time-consuming case by case eligibility determinations. Commenting on a different challenge to the criteria for CIB in section 202(d)(8), this court recently held: "To the extent that the statute might yield unfair results, it is a cost that Congress was willing to accept as part. of administering a large social insurance program. It is a policy decision that the courts must enforce." *Pulley v. Bowen,* 817 F.2d 453, 454 (7th Cir.1987) (per curiam). We do not question the sincere motives behind the Lindleys' decision to adopt David. However, we see no reason why the Supreme Court's approach in *Salfi* should not still have force, especially in light of the well-known financial problems that have beset the social security system in recent years.

Since it is clear that Congress must be permitted to establish generally applicable rules for social security eligibility, we have only to consider David's assertion that the rules set out in section 202(d)(8) are irrational. One of the problems perceived by Congress in setting the eligibility requirements for "after-adopted children" was the potential for abuse of secondary benefits. The report of the House Ways and Means Committee on the 1972 Amendments to the Social Security Act, Pub.L. 92–603, stated:

> [The] committee believes that benefits for a child who is adopted by a worker already getting old age or disability benefits should be paid only when the child lost a source of support because his parent retired or became disabled, and that the law should include safeguards against abuse through adoption of children solely to qualify them for benefits. The committee has included in the bill a provision that it believes will accomplish these objectives.

H.Rep. No. 92–231, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 4989, 5039. We also note that a number of other circuits have upheld the constitutionality of section 202(d)(8) in the face of a challenge based upon the adopted *child's* equal protection interests. *Johnson v. Califano,* 656 F.2d 569 (10th Cir. 1981); *Rodriguez v. Secretary of Health, Educ. and Welfare,* 644 F.2d 918 (1st Cir. 1981); *Rundle v. Califano,* 639 F.2d 542 (9th Cir.1981); *Holbrook v. Califano,* 636 F.2d 157 (6th Cir.1980); *Tsosie v. Califano,* 630 F.2d 1328 (9th Cir.1980), *cert. denied sub nom. Tsosie v. Schweiker,* 451 U.S. 940, 101 S.Ct. 2022, 68 L.Ed.2d 328 (1981); *Brehm v. Harris,* 619 F.2d 1016 (3d Cir. 1980); *Clayborne v. Califano,* 603 F.2d 372 (2d Cir.1979); *Williams v. Califano,* 566 F.2d 1044 (5th Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978). We do not perceive any significant difference between a challenge based on adoptive parents' rights as opposed to an adopted child's rights. If anything, the child's interest in being adopted may be more compelling than the interest of potential parents in adopting. State adoption proceedings center upon the best interest of the *child,* not the desires, however intense, of potential parents to add to their family by adoption. If the child cannot succeed in maintaining a equal protection claim under this statute, we fail to see how her or his adoptive parents may prevail.

Like Magistrate Cohn, we certainly sympathize with the Lindleys. The restrictions placed on disabled parents who genuinely wish to adopt a child may well benefit from congressional reconsideration. But the present law, however unwise, is not unconstitutional. The judgment of the district court is

AFFIRMED.