Rose COLLIER, Plaintiff,

v.

Mary KRANE, Director of the Department of Social Services of the City and County of Denver, Federico Peña, Mayor of the City and County of Denver, Maria Davis, Ann Dechant, and William Lindsay, Defendants.

Civ. A. No. 89–S–862.

United States District Court,
D. Colorado.

May 1, 1991.

Paul Radosevich, Denver, Colo., for plaintiff.

Niels Loechell, Asst. City Atty., Claims Unit, Denver, Colo., for defendants.

## ORDER

SPARR, District Judge.

THIS MATTER comes before the Court on Defendants' motion for summary judgment. The matter has been fully briefed and oral argument has been heard.

### The Complaint

This action was originally filed in the Denver District Court, and was removed by Defendants. The complaint is filed under 42 U.S.C. § 1983 as "wrongful adoption." The Plaintiff alleges that Defendants intentionally or with deliberate indifference made material false representation to Plaintiff and her former husband, Walter Collier (not a party to this action) or failed to disclose material information regarding the physical and mental status and background of the Baby Boy [1] prior to the completion of the adoption of Baby Boy.

In another paragraph, Plaintiff alleges that Defendant Davis told her that Baby Boy was in good health and "came from good physical and mental stock," and later certified that Baby Boy's mental and physical condition made him a proper subject for adoption. In addition, Plaintiff alleges that she and Walter Collier acted in reliance on these representations in adopting Baby Boy and subsequently learned that Baby Boy had numerous psychological and physical disorders. The rights which Plaintiff identifies in her complaint as having been violated are the "rights, privileges and immunities secured her by the Constitution and laws ..." Amended complaint at 3.

All Defendants, subsequent to their identification by name in the amended complaint, have filed answers. Defendants then jointly filed this motion for summary judgment.

### Factual Background

The "wrongful adoption" [2] is based on the adoption by Plaintiff and Walter Collier of Baby Boy. The background of Baby Boy prior to the adoption by Plaintiff is mercifully short. Baby Boy was the second child born to his biological mother. The first child, also a son, was born October 2, 1974. He was placed in the Department of Social Services' (DoSS) custody at the age of four months after he was brought to Denver General Hospital by a neighbor. The infant's condition was diagnosed as failure to thrive, secondary to viral gastroenteritis. Baby Boy was born October 28, 1976. On October 29, 1976, DoSS filed a petition for dependency and neglect on behalf of Baby Boy, noting in its affidavit in support that it was concerned that Baby Boy not be subjected to his potentially injurious mother. No information was available in the confidential file made available to the Court regarding the Baby Boy's father. Evidently, he provided no support to the child and Baby Boy's mother offered no information concerning his background. Baby Boy was originally placed with Plaintiff and Walter Collier and their family as a foster child on April 2, 1978. Placement for adoption was approved by the Juvenile Court on June 21, 1978.

Based on the Court's perusal of the Defendants' exhibits to the motion for summary judgment, many of which are from confidential court files, it is apparent that the misrepresentation which is the ultimate source of Plaintiff's complaint, that Baby

---

**1.** Although the child is named in the complaint, subsequent pleadings including the motion for summary judgment, response and reply, were filed under seal pursuant to the direction of this Court (order of August 22, 1989). For the same reasons as those pleadings were filed under seal, the Court will not name the child subject of this "wrongful adoption" action.

**2.** This action was filed as a wrongful adoption under 42 U.S.C. § 1983. The Court would note that the nature of these claims bear little if any resemblance to claims such as wrongful birth or wrongful life. Wrongful birth is a medical malpractice claim brought by parents on behalf of a

child born with an impairment or birth defect and which alleges that but for the physician's misinformation or failure to inform, the child would not have been conceived or carried to term. Wrongful life is a medical malpractice claim in which the child alleges that but for the physician's negligence, it would not have been born to suffer the impairment. See *Lininger v. Eisenbaum*, 764 P.2d 1202, 1204 (Colo.1988). In the present case, the adoptive mother's claim (which was derived from procedure arising from state action of adoption) appears antagonistic to the interests of the child.

Boy "came from good physical and mental stock," is based on certain tendencies from his natural mother. Plaintiff has identified these to be genetically linked.

### Defendants' Motion For Summary Judgment

Defendants move for summary judgment on several grounds. The Court will focus its discussion on two primary issues: whether the Plaintiff has established a claim cognizable under § 1983; and whether Defendants are "persons" under § 1983 and pursuant to the decision in *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

The Court will read the pleadings in these motions in the light most favorable to the Plaintiffs. *McKay v. Hammock,* 730 F.2d 1367, 1371 (10th Cir.1984). For direction as to the standard regarding consideration of the motions for summary judgment, Fed.R.Civ.P. 56(c) states that summary judgment is proper if the pleadings, depositions answers, affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The nonmovant must, in the words of the Rule, come forward with "specific facts showing a *genuine issue for trial.*" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The inquiry performed by the district court is the threshold inquiry of determining whether there are any genuine factual issues that must be resolved by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Rule 56(c) requires the Court to enter summary judgment if the evidence favoring the nonmovant party is not sufficient for the jury to enter a verdict in his favor. *Id.* The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### I.

#### A. Prima Facie Case Under § 1983.

█ To state a claim for relief under § 1983, a plaintiff must be able to demonstrate that he was deprived of a right secured by the Constitution or laws of the United States, and that any such deprivation was achieved under color of law. *Wise v. Bravo,* 666 F.2d 1328 (10th Cir.1981), citing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), *reh'g denied,* 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). It must also be noted that § 1983 does not, standing alone, create any equal or civil rights of citizens; rather, it provides a remedy for rights guaranteed by the Constitution or laws of the United States. *Wise v. Bravo,* 666 F.2d at 1331, citing *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

█ Because § 1983 creates no substantive rights, a plaintiff must identify the right involved as stated above. In this case, the Plaintiff has stated only that her "rights, privileges and immunities secured her by the Constitution and law" (amended complaint at 3) have been violated by Defendants' actions. In her response to the Defendants' motion for summary judgment, Plaintiff does state that the second set of interrogatories sets forth that Plaintiff alleges that her due process and privacy rights have been violated. In responding to the Defendants' arguments that they are entitled to qualified immunity, Plaintiff provides some further explanation of the constitutional or statutory rights involved. Citing to cases which recognize a private realm of family life which the State cannot enter (*Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944)); concern the breakup of a natural family (*Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)); and protect the family relationship which

falls outside the nuclear family definition (*Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)), Plaintiff fails to address one fundamental point. The family relationship which lies at the core of this action is an adoptive one. While the biological family relationship is a recognized and protected interest in both our Constitution and natural law, the adoptive family relationship differs in several substantial ways. The adoptive family's rights, like those of the foster family, arise from state statute. The adoption process is entirely a creature of state law, and parental rights and expectations involving adoption have historically been guarded by legislative enactment. *Lindley for Lindley v. Sullivan*, 889 F.2d 124, 130 (7th Cir.1989). The *Lindley* court drew another distinction between natural procreation and adoption: "Adoption always involves the weighing and balancing of many competing interests. The rights of a couple to adopt must be reconciled with the State's interest in protecting the existing rights of the natural parents,[3] as well as in securing ultimately *the welfare of the child.*" (emphasis added) 889 F.2d at 131.

The Supreme Court, in treating the issue of whether foster children were deprived of their liberty interests by disruption of the children's relationships with foster parents, has noted important distinctions between the foster family and the natural family: "Unlike the earlier cases recognizing a right to family privacy, the State seeks here to interfere, not with a relationship having its origins entirely apart from the State, but with the foster family which has its source in state law and contractual agreements. *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094.

In addition to her failure to recognize the important distinctions between the nature of the rights inherent in biological and adoptive families, Plaintiff also does not distinguish the alleged damage suffered— as adoptive parent, from the process of the adoption, which she claims is the cause of her damage. Because the damage alleged to have been suffered *after* the adoption is based on Plaintiff's status as adoptive parent,[4] and is therefore of a character distinct from the process of adoption, the Court's inquiry will focus on the adoption process.

The Seventh Circuit in *Lindley v. Sullivan* analyzed the Illinois adoption statute (which it described as "typical"), concluding that "[b]ecause the adoption process is entirely conditioned upon the combination of so many variables, we are constrained to conclude that there is no fundamental right to adopt." That court also decided to find that the interest in adopting a child falls within the marital privacy right, since that statute requires adopters to submit their personal lives to intensive scrutiny before the adoption may be approved. The court then concluded it could find neither a fundamental right nor a privacy interest in adopting a child. 889 F.2d at 131.

### B.  Discussion of Rights At Issue During the Adoption Process.

The rights of the Plaintiff which she enjoyed prior to the adoption of her son, *e.g.*, when he was a foster child, may stand in sharp contrast to her substantive rights as an adoptive parent. The process of adoption implicates a duty on the part of the State to see that the best interests of the child and its welfare are served by the decree of adoption. See Colo.Rev.Stat. § 19–4–107 (1986 repl. vol.) and comments; *Clerkin v. Geisendorfer*, 137 Colo. 139, 323 P.2d 633 (1958). The adoption process gives rise to a special relationship between

---

3.  Such rights were extinguished in the case of Baby Boy.

4.  In *Rivera v. Marcus*, 696 F.2d 1016 (2d Cir. 1982), the court held that the half-sister with whom two siblings had resided prior to the institutionalization of their mother possessed an important liberty interest (which differed substantially from a typical foster care situation) which was entitled to protection from state action which threatens the integrity and stability of their familial relationship. No such interest is at issue here—the provision of the child, not its removal, is essentially the subject of dispute here. Ultimately, the adoptive parent stands in a situation similar to that of biological parent once the adoption process is completed.

the minor child and the State. In a case concerning foster children's right to associate with relatives, the Ninth Circuit found that foster children had a protectable liberty interest in residing with relatives and that the State had a duty to make a reasonable effort to assist foster children with their rights to reside with relatives. That court noted that in such a special custodial relationship, the State assumes an affirmative obligation to secure those individuals' constitutional liberty.[5] *Lipscomb by and through DeFehr v. Simmons*, 884 F.2d 1242, 1246 (9th Cir.1989), *reh'g granted* 907 F.2d 114 (1990). In further explanation of the State's duty to assist the child and generally act *in loco parentis*, the court noted: "When a State removes abused and neglected children from their parents' homes, it assumes responsibility for ensuring that their basic needs are met and their fundamental rights respected." 884 F.2d at 1249. The natural object of the State's concern in an adoption proceeding is the child. The child's welfare is paramount. This is evident in the rigorous background checking of the prospective parents, as well as the nature of the considerations in a hearing on an adoption petition. See Colo. Rev.Stat. § 19–4–112.

Due to the nature of the prospective parents' interest involved here, due process requirements do not come into play. See *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094. Even if the Plaintiff could identify a due process interest, it would not be capable of meeting the three elements required in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Plaintiff is also unable to show that any fundamental right of familial association is implicated. In a decision holding that the mother and a sister of a decedent who died in a county jail had standing and constitutionally protected interests in a § 1983 action, the Tenth Circuit described the right to freedom of intimate association. *Trujillo v. Board of County Com'rs of County*

*of Santa Fe*, 768 F.2d 1186 (10th Cir.1985), citing *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In *Trujillo*, the court noted initially that "family relationships, which by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctly personal aspects of one's life." *Trujillo*, 768 F.2d at 1188. The Tenth Circuit also held that where the freedom of intimate association is implicated in a § 1983 action, an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under § 1983. 768 F.2d at 1190. Due to the nature of the conflict between Plaintiff's status (as adoptive mother) at the time of the filing of the complaint and her status during the adoption proceeding, it is clear that no right of familial or intimate association is implicated here.

One additional argument that Plaintiff might raise concerns her right to privacy and the concomitant right to receive important information. In a decision holding that a state statute requiring adults adopted as children to show good cause to gain access to their adoption records was not an unconstitutional exercise of state power, the court held:

> Plaintiffs' rights to privacy and to receive important information are not constitutionally abridged by the New York statutes but rather are permissibly limited in accordance with a valid state interest to balance conflicting rights of privacy and to protect the integrity of the adoption process, which is likely to suffer if the assurances of secrecy are not present.

*Alma Society, Inc. v. Mellon*, 459 F.Supp. 912, 917 (S.D.N.Y.1978), *aff'd* 601 F.2d 1225 (2d Cir.1979), *cert. denied* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979).

---

**5.** The relationship was held to extend § 1983 liability on behalf of the State where plaintiff foster child was beaten while residing in a foster home. See, *Taylor ex rel. Walker v. Ledbet-*

*ter*, 818 F.2d 791 (11th Cir.1987), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989).

As noted previously, the adoption process is designed to protect the best interests of the child in placing it in a suitable home. As a secondary matter, the rights of the biological parents (no such rights were at issue in this case as parental rights were terminated prior to adoption) will be considered. No provision for protecting the "rights" of the adoptive parents in obtaining a suitable child are mentioned in the statutory scheme, and no such right can be inferred from other sources.

■ The Court also notes that, since no constitutional rights or federal statutory law has been implicated here, there can be no basis for a § 1983 action. Allegation of a tort is not a sufficient basis for a § 1983 action. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155. Addressing similar concerns, the Supreme Court noted later in *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986):

> But in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right [the due process clause of the Fourteenth Amendment implicated in this decision], merely negligent conduct may not be enough to state a claim (citations omitted).

Finally, the Court wishes to note the theoretical "Catch-22" in which the Plaintiff finds herself here in attempting to make out a § 1983 claim. Her standing in this suit, as well as her claim for damages, is based on her status as Baby Boy's adoptive mother. The alleged wrongs which Plaintiff has attempted to fashion into a § 1983 claim are based on the process by which she adopted the baby. Based on the discussion above, the Plaintiff can assert no cognizable § 1983 claim based on Defendants' actions during the process of adoption. The adoption schematic is uniquely state law, and there appear to be no rights raised here which belong to the Plaintiff the violation of which could serve as the basis for § 1983 liability. With regard to the status of Plaintiff as adoptive mother, the adopted child, for all practical intents and purposes, now occupies a situation similar in many ways to that of a biological child of the Plaintiff. Holding the State liable for its role in the myriad of problems it is alleged the child now faces would be tantamount to holding the Creator liable for the defects of a child born to its natural parents.

Accordingly, Plaintiff is unable to state a claim under § 1983 as she cannot demonstrate that she was deprived of a right secured by the Constitution or laws of the United States.

## II.

■ The Court also determines that Defendants are not "persons" for § 1983 purposes. In addition to Plaintiff's inability to state a claim under § 1983, Plaintiff is also unable to maintain suit against the Department of Social Services Defendants because the DoSS is not a "person" for purposes of § 1983 liability. *Wigger v. McKee, et al.*, 809 P.2d 999 (Colo.App.1990) *cert. denied* No. 90 SC 480 (Colo. April 15, 1991) In addition, the claims against the individual Defendants sued in their official capacities and acting on behalf of DoSS, Mary Krane, Maria Davis, Ann Dechant, and William Lindsay, must also fail, as the Plaintiff's claim is actually a claim against the Office of Social Services. *Will v. Michigan Department of State Police*, 109 S.Ct. at 2311.

■ The Defendant City and County of Denver (with Defendant Federico Peña as Mayor) is sued as a municipal corporation which has allowed conduct "similar to" Defendant Davis' to become common practice or custom. The City and County of Denver and its Mayor cannot be held liable under a respondeat superior theory. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). It also follows that, the City and County of Denver cannot be held liable under any exceptions to *Monell* (*e.g.*, where a valid policy is unconstitutionally applied) such as *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) because the Department of Social Services answers to the State, not the municipal authority of the City of Denver. As a consequence of the

DoSS Defendants not being "persons" for § 1983 purposes, it is unnecessary to address any issues concerning the Eleventh Amendment.

■ With regard to the issue of qualified immunity, it appears the doctrine may be implicated as relating to the Defendant Maria Davis.[6] The Plaintiff indicated in her response to the summary judgment motion that Maria Davis was sued in both her official and individual capacities. With regard to individual personal liability under § 1983, Davis' (or any other DoSS employee's) liability must be viewed in light of the doctrine of qualified immunity. Here, the Court applies an objective test to determine whether qualified immunity applies. *Pueblo Neighborhood Health Centers v. Losavio*, 847 F.2d 642 (10th Cir.1988). That test is whether the Defendant violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it. *Losavio*, 847 F.2d at 645. As articulated above in the discussion of whether Plaintiff has a claim cognizable under § 1983, Plaintiff is unable to identify any clearly established right and cannot thereby allege that any Defendants violated it. The qualified immunity defense provides ample protection to all but the plainly incompetent or those who knowingly violate the law. *Powell v. Mikulecky*, 891 F.2d 1454, 1456 (10th Cir.1989) citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Because Defendant Davis could not have been aware of any such "rights" that the Plaintiff was entitled to during the adoption process, there could also be no violation.

### III.

The issue of whether this action is barred by the statute of limitations is moot. This issue will not be discussed, as the Court has determined the Plaintiff has no claim cognizable under § 1983 against the Defendants.

Accordingly, for the reasons stated in this ORDER, the Defendants' motion for summary judgment is GRANTED. The Clerk is directed to enter judgment in favor of the Defendants, each party to bear its own costs.

---

**6.** The complaint and amended complaint do not indicate that any of the Defendants are sued in an individual capacity.