James Edward **YOUNG** and Joan Young, Individually, as Husband and Wife, and as Administrators of the Estate of Allan Schreffler a/k/a James Edward Young, Plaintiffs,

v.

Helen **FRANCIS**, Kathy Hume, H. Scott Campbell, Dr. Albert Lemicke, and Children & Youth Services of Delaware County, Defendants.

Civ. A. No. 92–7088.

United States District Court, E.D. Pennsylvania.

May 4, 1993.

Steven H. Rubin, Wayne, PA, for plaintiffs.

Michael P. Dignazio, Nelson & Dignazio, Media, PA, for defendants except Lemicke.

Bart C. Tuttle, O'Brien & Ryan, Plymouth Meeting, PA, for Albert Lemicke.

**MEMORANDUM**

LOWELL A. REED, Jr., District Judge.

## I. *INTRODUCTION*

This case stems from the tragic sudden death of Allan Schreffler ("Schreffler" or "the child"), a foster child awaiting adoption by the plaintiffs. Plaintiffs assert various constitutional and supplemental state claims against Children and Youth Services of Delaware County ("CYS"), the office which oversaw Schreffler's intended adoption, and several of its agents.

The defendants have filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1), arguing that plaintiffs' claims fail to arise under the Constitution, laws, or treaties of the United States, and thus that this Court lacks subject matter jurisdiction over the complaint (Document No. 3). Jurisdiction is predicated upon the existence of a federal question under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343. The supplemental jurisdiction of this Court, 28 U.S.C. § 1367, is invoked for plaintiffs' state claims. Upon consideration of the motion to dismiss, the response of plaintiffs thereto, and the reply of the defendants, I shall grant the motion in part and deny it in part.

## II. FACTUAL BACKGROUND

The unhappy tale from which this lawsuit arose, taken from the complaint, is as follows. Plaintiffs James Edward Young and Joan Young (collectively "plaintiffs") are residents of Drexel Hill, Pennsylvania. They were married in June 1976 and were allegedly unable to conceive a child during the course of their marriage.

In 1989, plaintiffs claim that they filed an application for adoption with CYS through its foster parent and adoption program.[1] In July 1990, plaintiffs purportedly received a telephone call from a CYS employee, who advised plaintiffs that a child was available for adoption. The child, Schreffler, was placed into the custody of plaintiffs by CYS on September 27, 1990. The parental rights of Schreffler's biological parents were allegedly terminated in December 1990 and January 1991 in Delaware County, Pennsylvania. Plaintiffs assert that they filed a Report of Intention to Adopt Schreffler on February 11, 1991.

Over the course of 1990 and 1991, plaintiffs contend that they had numerous conversations with the defendants concerning the social background of Schreffler, the adoption process, and the medical condition of the child. During this process, plaintiffs claim that CYS investigated plaintiffs and found them to be fit and appropriate parents to adopt a child through their agency.

Plaintiffs assert that while learning about Schreffler, they were told by defendants that a "left-sided weakness" had been identified in him, and that he would be re-tested. On several subsequent occasions, plaintiffs allege that defendants informed them that the child had been tested again and that the neurological test results were normal. Plaintiffs claim, however, that defendant CYS, through defendant Dr. Albert Lemicke ("Lemicke"), ordered additional neurological testing of Schreffler. They contend that these additional tests were conducted by Dr. Charles B. Brill ("Brill"), Clinical Professor of Pediatrics and Neurology at Jefferson Medical College in Philadelphia, who issued a report to Lemicke on August 9, 1990. Plaintiffs set forth the following excerpt from the report in the complaint:[2]

> Allan Schraffler [sic] has mild bi-lateral long tract signs, left more marked than the right. In addition, he has a suggestion of a left homonymous hemianopia ... *[and] prospective adopting parents should be told of the neurologic abnormalities and be made aware of the fact that the child's future neuro-developmental prognosis is guarded.*

(Emphasis in complaint.)

Plaintiffs further allege that on August 17, 1990, a test known as an EEG was performed on the child at the request of Brill and Lemicke. The EEG report purportedly stated that the results of this test were "probably normal; however, it is technically limited and should be repeated at no charge to the patient." Plaintiffs claim that defendants knew or should have known that the results of the EEG and Brill's report suggested that Schreffler suffered from neurologic abnormalities. Plaintiffs assert that after August 1990, defendants told them only that tests of the child produced normal results and that "everything was okay." They

---

**1.** Plaintiffs describe CYS as an agency of Delaware County, Pennsylvania that administers laws and programs relating to protective services and adoptive placement for children, and maintains an office in Media, Pennsylvania.

**2.** The report issued by Brill is included as Exhibit B to the complaint.

contend they were never informed that an additional EEG was recommended by the electroencephalographer who performed the first EEG test.

Plaintiffs further claim that upon receiving the assurances from defendants that the child's health was sound, they accepted custody of him on September 27, 1990 with the intention of adopting him. On April 1, 1991, plaintiffs allege that they found Schreffler not breathing in his crib. They assert that in response, they rushed Schreffler to the Fitzgerald Mercy Catholic Medical Center in Darby, Pennsylvania. The child was allegedly then transported by Sky Flight Care to Thomas Jefferson University Hospital in Philadelphia, where he was pronounced dead on April 2, 1991. Plaintiffs do not describe the cause of death in the complaint or in the papers they have submitted in response to the pending motion. Defendants, however, state in their supporting memorandum of law that Schreffler died from Sudden Infant Death Syndrome ("SIDS"), commonly referred to as "crib death." Plaintiffs were appointed administrators of Schreffler's estate in March 1992.

After Schreffler's death, plaintiffs claim that they requested and received his medical records, which revealed to the plaintiffs for the first time that a second EEG test had been recommended, that neurological abnormalities existed, and that the child's prognosis concerning his future neurological development remained guarded. Plaintiffs assert that at no time prior to Schreffler's death did CYS, Lemicke, or any other agent or employee of CYS disclose to them the neurological information described above, notwithstanding numerous requests plaintiffs allegedly made for this information.

## III. *DISCUSSION*

### A. *The Rule 12(b)(1) Standard of Review*

Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(1), claiming that this Court lacks subject matter jurisdiction. I recently explained the unique procedural filter through which a complaint is reviewed under Rule 12(b)(1) in *Marlee Elec-*

*tronics Corp. v. Eclectic Technologies, et al.,* No. 90–5536, 1993 WL 30081, 1993 U.S.Dist. LEXIS 1123 (E.D.Pa. Feb. 4, 1993).

A Rule 12(b)(1) motion to dismiss can take two forms: It can attack a complaint on its face, what the cases call a "facial attack," or it can attack the existence of subject matter jurisdiction in fact, an approach commonly described as a "factual attack." *Marlee Electronics Corp.,* 1993 WL 30081, at *6, 1993 U.S.Dist. LEXIS 1123, at *16 (citing *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). In reviewing a facial attack, a court must consider the allegations of the complaint as true. *Id.,* 1993 WL 30081, at *6, 1993 U.S.Dist. LEXIS 1123, at *17 (citing *Mortensen,* 549 F.2d at 891). In a factual attack, however,

> the trial court may proceed as it never could under Rule 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims.

*Id.* (citing *Mortensen,* 549 F.2d at 891). The factual evaluation under Rule 12(b)(1) may occur at any stage of the case, "from the time the answer has been served until after the trial has been completed." *Id.* (quoting *Mortensen,* 549 F.2d at 891–92).

The burden of proving the existence of subject matter jurisdiction rests with the plaintiff. *Id.,* 1993 WL 30081, at *6, 1993 U.S.Dist. LEXIS 1123, at *17–*18 (citations omitted). " 'Trial judges enjoy substantial procedural flexibility in handling Rule 12(b)(1) motions.' " *Id.,* at *6, 1993 U.S.Dist. LEXIS 1123, at *18 (quoting *Berardi v. Swanson Memorial Lodge,* 920 F.2d 198, 200 (3d Cir.1990)).

Defendants have not labeled their Rule 12(b)(1) motion as either a factual attack or facial attack. It is clear, however, that they

have chosen the latter approach, because they focus solely on the federal causes of action alleged in the complaint and argue that these claims are simply not cognizable under the Constitution, laws, or treaties of the United States. In reviewing the motion, I must heed decisions from the courts of appeals following *Mortensen* which have repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits under Rule 12(b)(6). *See, e.g., Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1280–81 (3d Cir. 1993); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408–09 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *Holland/Blue Streak v. Barthelemy*, 849 F.2d 987, 988–89 (5th Cir. 1988).[3]

██ As the court of appeals stated in *Kehr Packages*, "a plaintiff may be prejudiced if what is, in essence, a Rule 12(b)(6) challenge to the complaint is treated as a Rule 12(b)(1) motion." *Kehr Packages, Inc.*, 926 F.2d at 1409. The standards of review under Rule 12(b)(1) and Rule 12(b)(6) are indeed quite different. An action based upon the alleged existence of a federal question may be dismissed for lack of subject matter jurisdiction only if the allegation is " 'made solely for the purpose of obtaining jurisdiction,' " or is " 'wholly insubstantial and frivolous.' " *Kulick*, 816 F.2d at 898 (quoting *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). This test does not allow a court "to prejudge the facts alleged in the complaint, however, for a court may dismiss for lack of jurisdiction only if claims are 'insubstantial on their face.' " *Id.* (quoting *Hagans v. Lavine*, 415 U.S. 528, 542 n. 10, 94 S.Ct. 1372, 1382, n. 10, 39 L.Ed.2d 577 (1974)). Dismissal for lack of subject matter jurisdiction is not warranted simply because the legal theory alleged is probably false; it is appropriate only where the federal claim is " 'so insubstantial, implausible, foreclosed by

prior [court] decisions . . ., or otherwise completely devoid of merit as not to involve a federal controversy.' " *Id.* at 899 (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974)).

·██ The standard governing a Rule 12(b)(6) motion to dismiss for failure to state a claim is not as constrained as the Rule 12(b)(1) standard of review just described. A federal claim being reviewed under Rule 12(b)(6) does not have to be "wholly insubstantial" to be dismissed. *Kehr Packages, Inc.*, 926 F.2d at 1409. " 'The threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion.' " *Id.* (quoting *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir.1989)). As the court of appeals recently stated in *Growth Horizons, Inc.*,

'whether the complaint states a cause of action on which relief could be granted is a question of law and . . . it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.'

*Growth Horizons, Inc.*, 983 F.2d at 1280 (quoting *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). *See also Kehr Packages, Inc.*, 926 F.2d at 1409 ("We stress . . . that challenges for failure to state a claim ordinarily should be made under Rule 12(b)(6).") (citing *Bell*, 327 U.S. at 682, 66 S.Ct. at 776).

### B. *Analysis of Plaintiffs' Alleged Constitutional Claims*

██ For plaintiffs to prevail in a Section 1983 action, they must prove (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that the conduct deprived a person of

---

3. The Court of Appeals for the Third Circuit has on at least three occasions reversed district court dismissals of complaints for lack of subject matter jurisdiction where the factual and legal issues addressed by the district court pertained not to jurisdiction, but to the merits. *See Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277 (3d Cir.1993); *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895 (3d Cir.1987); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977).

rights, privileges, or immunities secured by the Constitution or laws of the United States. *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1141–42 (3d Cir.1990) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981)). There is no dispute among the parties here that defendants were state actors during the relevant period. Defendants argue instead that plaintiffs' claims do not constitute a federal question.

Plaintiffs contend that in failing to provide them with an accurate picture of Schreffler's health prior to their providing a home for the child, defendants engaged in violations of the First, Ninth, and Fourteenth Amendments of the United States Constitution. Specifically, plaintiffs claim that this alleged conduct

1) interfered with the family relationship between plaintiffs and the child, which is protected by the constitutional right to freedom of family association;

2) interfered with the child's liberty interests in a relationship with the plaintiffs; and

3) interfered with Schreffler's liberty interests in life.

Complaint at ¶ 49; Plaintiffs' Memorandum of Law in Opposition to Defendants' Rule 12(b)(1) Motion to Dismiss ("Plaintiffs' Memo.") at p. 6.

### *1) Interference with Plaintiffs' and Schreffler's Right to Family Association*

■ The Supreme Court has held on several occasions that the parent-child relationship is protected as a fundamental liberty interest under the Due Process Clause of the Fourteenth Amendment. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982); *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). Defendants do not deny the constitutional protection afforded the relationship of parents and children. Rather, they argue that neither plaintiffs nor Schreffler ever possessed this protection, because plaintiffs adoption of Schreffler was never completed; therefore, plaintiffs and the child never assumed the constitutionally protected status of parents and child. Adoption is, defendants assert, solely a creature of state statute, and in the absence of strict compliance with the Pennsylvania Adoption Act, 23 Pa.Cons.Stat.Ann. §§ 2101 *et seq.*, including the issuance of a final judicial decree of adoption, no legal adoption exists. Defendants' Memorandum in Support of Rule 12(b)(1) Motion to Dismiss ("Defendants' Memo.") at pp. 3–4; Defendants' Reply Memorandum ("Defendants' Reply") at pp. 1–2.

Plaintiffs argue in response that defendants are being overly formalistic. They assert that "[g]iven the unique facts of the Youngs' case, the lack of a final adoption decree should not be held to deny the Youngs and the child their constitutional rights." Plaintiffs' Memo. at p. 5. Plaintiffs dispute defendants description of the relationship of plaintiffs and Schreffler as foster parents and foster child, claiming that these labels ignore the reality of the relationship they had. They point to their taking custody of the child on September 27, 1990 with the intention of adopting him, the termination of the parental rights of Schreffler's natural parents in December 1990 and January 1991, their filing on February 11, 1991 of the Report of Child Intended to be Adopted, *see* 23 Pa.Cons.Stat.Ann. § 2531, and the filing by the defendants on March 20, 1991 of the Report of Intermediary, required under 23 Pa.Cons.Stat.Ann. § 2533. Plaintiffs' Memo. at p. 3.

Plaintiffs cite several additional factors in support of parental status vis-a-vis Schreffler. They note that they handled the funeral arrangements for the child, that the name of the decedent on the Death Certificate was "James Edward Young," the name plaintiffs gave to the child, and that they were appointed Administrators of the Estate of "James Edward Young." Plaintiffs also argue that the defendants themselves made statements suggesting that they considered plaintiffs to be Schreffler's parents. Plaintiffs cite an April 30, 1991 letter from defendant Kathy Hume ("Hume") to plaintiffs, informing them that there could be no final adoption proceeding because the child had died. In the April

30 letter, Hume stated: "I would still hope that you can come to some peace in knowing that you are Jed's parents in your heart, in the loving care you gave him and in all the wonderful memories you have of him. These are the truly most important ways of parenting!" Plaintiffs' Memo. at p. 5 (quoting April 30, 1991 letter from Hume, Exhibit C to Plaintiffs' Memo.).

It is clear that plaintiffs developed a strong emotional and supportive bond with Schreffler. All children should be so fortunate. Nevertheless, defendants have not engaged in empty formalism by arguing that plaintiffs and Schreffler lacked the constitutionally shielded status of parents and child due to the inchoate nature of Schreffler's adoption. As the Supreme Court of Pennsylvania has stated:

> Adoption is a purely statutory right unknown at the common law. To effect an adoption, the legislative provisions of the Adoption Act must be strictly complied with. *Gunther Adoption Case*, 416 Pa. 237, 206 A.2d 61 (1965); *Schwab Adoption Case*, 355 Pa. 534, 50 A.2d 504 (1938). Our courts have no authority to decree an adoption in the absence of the statutorily required consents. Nor may exceptions to the Adoption Act be judicially created where the Legislature did not see fit to create them.

*In re Adoption of E.M.A.*, 487 Pa. 152, 409 A.2d 10, 11 (1979). *See also Matter of Adoption of Sturgeon*, 300 Pa.Super. 92, 445 A.2d 1314, 1322 (1982) ("Although we sympathize with the shock and confusion of the pre-adoptive parents, as indeed the lower court must have done, they were not entitled at any time to the protections afforded a natural parent and could not acquire such protections prior to final adoption.").

I have found no Third Circuit case discussing allegations of a failure adequately to disclose medical information about a child in an adoption setting. I have located one Pennsylvania case with similar facts, *Gibbs v. Ernst*, 150 Pa.Cmwlth. 154, 615 A.2d 851 (1992). Plaintiffs in *Gibbs*, however, did not assert constitutional violations. The claims in that case were for common law fraud and misrepresentation. *Id.*, 615 A.2d at 855.

Defendants have brought to my attention a related case recently issued by the District of Colorado. In *Collier v. Krane*, 763 F.Supp. 473 (D.Colo.1991), plaintiff claimed that the director of social services for the City and County of Denver and certain other individuals made materially false representations to plaintiff and her former husband, or failed to disclose material information, regarding the physical and mental status and background of a child identified as the Baby Boy prior to completion of the adoption of this child. *Id.* at 474. Plaintiff focused on the alleged misrepresentation that Baby Boy "came from good physical and mental stock." *Id.* at 474–75. The constitutional rights plaintiff asserted were violated included the fundamental right to protection of the relationship among family members. *Id.* at 475–76.

The court in *Collier* granted summary judgment in favor of the defendants, concluding that although plaintiff may have a tort claim, she could not maintain a cause of action under Section 1983, because she could not demonstrate that she was deprived of a right secured by the Constitution or laws of the United States. *Collier*, 763 F.Supp. at 477–78. The court found that no fundamental right of familial association was implicated by plaintiff's allegations, as the conduct in question occurred prior to her adoption of Baby Boy. *Id.* at 476. In reaching this finding, the *Collier* court explained that

> [w]hile the biological family relationship is a recognized and protected interest in both our Constitution and natural law, the adoptive family relationship differs in several substantial ways. The adoptive family's rights, like those of the foster family, arise from state statute. The adoption process is entirely a creature of state law, and parental rights and expectations involving adoption have historically been guarded by legislative enactment.

*Id.* at 476 (citing *Lindley for Lindley v. Sullivan*, 889 F.2d 124, 130 (7th Cir.1989)).

Notwithstanding the filing of the Pennsylvania Report of Intention to Adopt and Report of Intermediary in the instant case, no Petition for Adoption, required by 23 Pa. Cons.Stat.Ann. § 2701, was filed by plaintiffs in the Court of Common Pleas of Delaware

County, and no final judicial decree of adoption was entered pursuant to 23 Pa.Cons. Stat.Ann. §§ 2901–10. I certainly empathize with the pain plaintiffs must feel from the untimely loss of Schreffler, but I cannot and will not transgress clearly marked legislative boundaries in order to uphold a claim for relief.

In short, at the time of Schreffler's death, his adoption by plaintiffs remained incomplete. Plaintiffs cannot, therefore, maintain claims for interference with their liberty interest in a relationship with Schreffler, or the child's liberty interest in a relationship with them. In the parlance of the Rule 12(b)(1) standard of review, I conclude that these constitutional claims are " 'implausible ... [and] foreclosed by prior decisions ... [and thus do not] involve a federal controversy.' " *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 899 (3d Cir.1987) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974)). Accordingly, these claims shall be dismissed with prejudice.

### 2) Interference with Schreffler's Liberty Interests in Life

As noted above, plaintiffs also assert, as administrators for Schreffler's estate, that defendants' conduct violated the child's fundamental liberty interest in life. In analyzing this claim, the elements plaintiffs' must meet can be divided, just as with an ordinary tort claim, into two separate parts. First, they must show that defendants owed Schreffler a duty of care. Second, plaintiffs must be able to demonstrate that defendants' actions or inactions failed to fulfill their duty of care and that this failure led proximately to the deprivation of the child's constitutional rights. *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir.1990).

In their motion, defendants have focused their energies on the first part of the foregoing test, arguing that they owed Schreffler no constitutional duty of care. They assert that the Court of Appeals for the Third Circuit, following Supreme Court case law, has limited the situations in which the state owes a duty of care and protection to so-called "special relationship" cases, where an individual's personal liberty has been restricted by incarceration or institutionalization against his will. Defendants' Memo. at pp. 5–7; Defendants' Reply at pp. 2–3. They contend that here, Schreffler was not in state custody at the time of his injury, but was awaiting adoption in a foster home, a setting in no way analogous to incarceration or institutionalization. *Id.*

The leading Supreme Court case discussing when a state has a duty to provide care and protection for its citizens is *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney*, the Court explained that nothing in the Due Process Clause of the Fourteenth Amendment required a state to protect the life, liberty and property of its citizens. *Id.* at 195, 109 S.Ct. at 1003. Rather, the Clause is phrased as a limitation on the power of the state to act, not as a guarantee of certain minimal levels of safety and security. *Id.*

The *DeShaney* Court stated that only in limited circumstances does the Constitution impose upon a state affirmative duties of care and protection. *DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1005. As examples, it pointed to its decision of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), where the Court held that the Eighth Amendment's protection against cruel and unusual punishment, made applicable to the states through the Fourteenth Amendment's Due Process Clause, required a state to provide adequate medical care to incarcerated prisoners, and *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), wherein the Court held that the substantive component of the Due Process Clause of the Fourteenth Amendment required a state to provide involuntarily committed mental patients with care necessary to ensure their reasonable safety from themselves and others. *DeShaney*, 489 U.S. at 198–99, 109 S.Ct. at 1004–05.

Together, the Court explained, *Estelle* and *Youngberg* stood for the proposition that once the state takes a person into its custody and holds him there against his will, the Constitution imposes upon the state a corresponding duty to assume some responsibility for his safety and general well-being. *De-*

*Shaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005–06. The Court stated that

> it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause.

*Id.* at 200, 109 S.Ct. at 1006. Further, the Court in *DeShaney* cautioned that "the Due Process Clause of the Fourteenth Amendment ... does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202, 109 S.Ct. at 1007 (citations omitted). In dictum, the Court noted that a situation analogous to incarceration or institutionalization giving rise to an affirmative duty to protect may arise when a state places a child in a foster home. *Id.* at 201 n. 9, 109 S.Ct. at 1006 n. 9.

The Court of Appeals for the Third Circuit recently revisited *DeShaney* and its progeny in *D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3d Cir.1992). There, the court of appeals stated that it had read *DeShaney* primarily as applying to scenarios involving a state's physical custody of a person. *Id.* at 1370 (citing *Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156, 167 (3d Cir.1989), and *Fialkowski v. Greenwich Home for Children, Inc.,* 921 F.2d 459 (3d Cir.1990)). The court held that the authority of officials of a vocational-technical school over plaintiffs as students during the day did not create the type of physical custody required to bring the state within the special relationship described in *DeShaney. Id.* at 1372. The school-children plaintiffs in *D.R. by L.R.,* the court of appeals explained, did not resemble prisoners or the involuntarily committed, because these children remained residents in their private homes, and thus could turn to persons unrelated to the state for help on a daily basis. *Id.* The state did nothing to restrict the plaintiffs' liberty after school hours and, accordingly, did not deny them meaningful access to sources of help. *Id.*

In reaching its conclusion regarding the custodial status of the student-plaintiffs in *D.R. by L.R.,* the court of appeals compared them to foster children. Like the *DeShaney* Court, the court noted that several courts of appeals had imposed a constitutional duty on the state to protect foster children by analogy to involuntarily institutionalized individuals. *D.R. by L.R.,* 972 F.2d at 1372. The court stated that the relationship between the state and foster children stems from the state's affirmative act of finding these children and placing them with state-approved families. *Id.* (citing *Taylor by and through Walker v. Ledbetter,* 818 F.2d 791, 794–97 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989)). In undertaking this action, "the state assumes an important continuing, if not immediate, responsibility for the child's well-being. In addition, the child's placement renders him or her dependent upon the state, through the foster family, to meet the child's basic needs." *Id.* (citing *Taylor,* 818 F.2d at 794–97).

The *D.R. by L.R.* court explained that minor students, by contrast, do not depend on the schools to provide their basic human needs. They are required under Pennsylvania law to spend only 180 six-hour days in the classroom per year, and their parents, even during the school day, remain their primary caretakers and decisionmakers. *D.R. by L.R.,* 972 F.2d at 1372 (citations omitted). The court thus concluded that the custodial status of the plaintiffs, public school students, did not resemble the special relationship the state has with foster children. *Id.*

■ Plaintiffs, as administrators of the estate of Schreffler, a foster child at the time of his death, claim that misrepresentations and omissions made by the defendants contributed to the death of this child. *See* Plaintiffs' Memo. at pp. 8 and 15. This claim may not have survived the scrutiny of a Rule 12(b)(6) motion to dismiss for failure to state a claim and may very well not emerge intact from a subsequent motion attacking the merits. I am constrained, however, by the Rule 12(b)(1) procedural posture in which I have been placed by the defendants. As discussed above, the standards of review under Rule 12(b)(1) and Rule 12(b)(6) are different. The threshold to withstand a motion to dismiss

under Rule 12(b)(1) is lower than what is required to withstand a motion under Rule 12(b)(6). I simply cannot find, based on the case law surveyed above, that in the words of the Rule 12(b)(1) standard, the theory of a deprivation of constitutional rights asserted on behalf of Schreffler is " 'so insubstantial, implausible, foreclosed by prior [court] decisions ..., or otherwise completely devoid of merit as not to involve a federal controversy.' " *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987) (quoting *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974)). Accordingly, I conclude that this Court has subject matter jurisdiction over the claim of a violation of Schreffler's constitutional rights.[4]

### C. *Supplemental Jurisdiction*

In light of my determination that this Court does not have subject matter jurisdiction over plaintiffs' claims of interference with the constitutionally protected right of familial association, I will briefly examine whether this Court may retain supplemental jurisdiction over plaintiffs' state law claims.

Both pendent and ancillary jurisdiction were merged under the heading of "supplemental jurisdiction" by the Judicial Improvements Act of 1990. The pertinent section of this statute provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

"Claims are part of the same constitutional case if they 'derive from a common nucleus of operative fact,' and 'are such that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding....' " *Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130,

1138, 16 L.Ed.2d 218 (1966)). Plaintiffs' state law claims include intentional misrepresentation, negligent misrepresentation, intentional infliction of emotional distress, negligent infliction of emotional distress, wrongful death, and restitution. I have read each of these claims and conclude that this Court may properly exercise supplemental jurisdiction over them, because they are derived from the same facts which underlie the surviving federal claim plaintiffs have alleged on behalf of Schreffler, and " 'are such that [plaintiffs] would ordinarily be expected to try them all in one judicial proceeding....' " *Sinclair,* 935 F.2d at 603 (citation omitted).

### IV. *CONCLUSION*

For the foregoing reasons, the motion of the defendants pursuant to Rule 12(b)(1) to dismiss plaintiffs' complaint for lack of subject matter jurisdiction will be granted in part and denied in part. The motion shall be granted with prejudice insofar as plaintiffs assert claims of interference with their liberty interest in a relationship with Schreffler and the child's liberty interest in a relationship with them, and denied to the extent that plaintiffs' assert a claim for the deprivation of Schreffler's constitutional rights.

---

4. Because I have determined that I have jurisdiction over the claim asserted on behalf of Schreffler based on the special-relationship case law just discussed, I need not address whether subject matter jurisdiction over this claim may also be founded upon the so-called state-created dan-

ger theory. *See D.R. by L.R.,* 972 F.2d at 1373 (constitutional liability under state-created danger theory predicated on finding that state agents acted to create plaintiff's danger, or to render him or her more vulnerable to it).